IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TERRI LYN WILLIAMS,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>　　　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:14-CV-304-DN<br><br>District Judge David Nuffer |

This case involves a claim for long-term disability ("LTD") benefits through a group insurance plan. Plaintiff Terri Lyn Williams ("Williams") brought a claim for breach of contract against Defendant Hartford Life and Accident Insurance Company ("Hartford") after it terminated her LTD benefits and denied her subsequent appeal.[1] The parties filed cross motions for summary judgment on March 31, 2015,[2] but stipulated that the case be decided by the court, as the trier of fact, on the record evidence and the parties' summary judgment memoranda.[3] Upon careful review of the evidence, briefing, and oral arguments, and for the reasons stated more fully below, Williams's Motion is GRANTED and Hartford's Motion is DENIED.

---

[1] Complaint, docket no. 2-2, filed Apr. 23, 2014.

[2] Hartford's Combined Motion for Summary Judgment and Opening Supporting Memorandum ("Hartford's Motion"), docket no. 17; Plaintiff's Motion for Summary Judgment ("Williams's Motion"), docket no. 18.

[3] Hartford's Response Memorandum in Opposition to Williams' Motion for Summary Judgment [ECF No. 18] ("Hartford's Response") at 1, docket no. 19, filed May 1, 2015; Opposition to Defendant's Combined Motion for Summary Judgment and Opening Supporting Memorandum ("Williams's Response") at 2, docket no. 20, filed May 1, 2015; Transcript of Proceedings dated June 15, 2015 ("Hearing Transcript") at 3:24-4:7, 4:13-17, docket no. 26, filed Jan. 6, 2017.

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... 2

BACKGROUND ................................................................................................................... 3

UNDISPUTED FACTS ......................................................................................................... 5

    Breach of Contract Claim Element 1: Existence of a Contractual Duty ............................ 6

        The Plan and Group Policy Provisions ...................................................... 6

    Breach of Contract Claim Element 2: Performance of the Contract by Williams ............. 9

        Proof of Loss ........................................................................................ 9

    Breach of Contract Claim Element 3: Breach of the Contract by Hartford ...................... 10

        Williams's LTD Claim ......................................................................... 10

        Hartford's Administration of Williams's LTD Claim After the Initial Approval .. 12

        Hartford's Any Occupation Investigation .............................................. 26

        Hartford's Determination of Williams's Appeal .................................... 39

    Breach of Contract Claim Element 4: Damages .......................................................... 41

        Initial Denial of Williams's Claim for LTD Benefits ............................. 41

        Denial of Williams's Appeal ................................................................ 42

    Summaries ................................................................................................................. 44

        Summary of Medical Evidence ............................................................ 44

        Summary of Medical Opinions Regarding Williams's Restrictions and Limitations
        .................................................................................................... 46

STANDARD OF REVIEW ................................................................................................... 52

DISCUSSION .................................................................................................................... 54

    Hartford has a contractual duty to pay LTD benefits to Williams ................................. 55

    Williams performed her duties under the Plan and Group Policy ................................... 57

        Williams properly applied for LTD benefits ........................................ 57

        Williams provided Hartford with timely and satisfactory Proof of Loss ............. 58

        Williams was and is under the Regular Care of a Physician ................................ 65

    Hartford breached its contractual duty to Williams by denying her claim for LTD benefits
    .................................................................................................................... 66

        Williams has a qualifying Disability that is not excluded from coverage and
            became Disabled while insured under the Plan and Group Policy .......... 66

        Williams remained Disabled beyond of the effective date of the Plan and Group
            Policy's Any Occupation provision ...................................................... 69

    Williams suffered damages as a result of Hartford's breach ........................................... 77

CONCLUSION ................................................................................................................... 78

ORDER ............................................................................................................................. 78

## BACKGROUND

Williams was employed as a teacher for the Sevier School District in Richfield, Utah until March 2011, when she stopped working due to a claimed disability.[4] She applied for, and was granted, LTD benefits, which Hartford paid until June 2013, when it terminated her benefits based on the insurance policy's narrowing of the definition of "Disability" after 24 months of benefit payments.[5]

Williams appealed Hartford's termination decision, alleging that she continued to be disabled under the insurance policy's terms.[6] She had several physical impairments in the first 24 months of disability payments and alleges a variety of current physical impairments, the greatest of which is fibromyalgia.[7] Williams's treating physician, Dr. Dwight Inouye, found her totally disabled due to fibromyalgia.[8]

On appeal, Hartford referred Williams's claim file to Dr. Joseph Rea for review.[9] Dr. Rea did not personally examine Williams.[10] In his report, Dr. Rea opined that Williams's work-related abilities were limited by a hip impairment, but acknowledged that she consistently complained of fibromyalgia.[11] Dr. Rea concluded that "fibromyalgia does not stand as an objective clinical entity (upon which impairment and resultant physical limitations can be

---

[4] Hartford's Submission of the Administrative Record ("Administrative Record") at 1195-1210, docket no. 14-12 and docket no. 14-13, filed Mar. 5, 2015.

[5] *Id*. at 199-205, docket no. 14-2 and docket no. 14-3, 345-47, docket no. 14-4, 1195-1210, docket no. 14-12 and docket no. 14-13.

[6] *Id*. at 368-70, docket no. 14-4.

[7] *Id*. at 184, docket no. 14-2, 865, docket no. 14-9, 1146-70, docket no. 14-12, 1195-1210, docket no. 14-12 and docket no. 14-13, 1203-05, docket no. 14-13, 1209-10, docket no. 14-13, 1238, docket no. 14-13.

[8] *Id*. at 865, docket no. 14-9.

[9] *Id*. at 354-61, docket no. 14-4.

[10] *Id*.

[11] *Id*. at 354-56, docket no. 14-4.

based)[.]"[12] Therefore, he assigned Williams's work-related limitations to her hip impairment, specifically excluding any limitations related to fibromyalgia.[13] Hartford adopted Dr. Rea's opinion, at least to the extent of his limitations, and denied Williams's appeal.[14] Hartford maintains that although it adopted Dr. Rea's limitations, it rejected his opinion relating to fibromyalgia.[15]

The policy itself does not exclude coverage for disabilities caused by fibromyalgia, nor does it affirmatively require a claimant to provide objective evidence of impairment and limitation.[16] Similarly, the policy does not exclude coverage for these types of impairments.[17] None of Hartford's referred health care professionals ever personally examined Williams.

Williams asserts a single cause of action for breach of contract against Hartford for its denial of her claim for LTD benefits.[18] Williams's claim against Hartford is not governed by the Employee Retirement Income Security Act of 1974 (ERISA).[19] The parties agree that because employee welfare benefit plans administered by government entities are specifically precluded from ERISA pre-emption, Williams's claim against Hartford is simply one for breach of a contract's express terms.[20] The parties filed cross motions for summary judgment on March 31,

---

[12] *Id*. at 357, 358, docket no. 14-4.

[13] *Id*.

[14] *Id*. at 190-92, docket no. 14-2.

[15] Hartford's Response at 12-18, docket no. 19, filed May 1, 2015; Hartford's Reply in Further Support of Its Combined Motion for Summary Judgment and Opening Supporting Memorandum, [ECF No. 17] ("Hartford's Reply") at 6, docket no. 22, filed May 18, 2015.

[16] Administrative Record at 10, 11, 19, 21, 22, 24, 25, 29, docket no. 14-1, filed Mar. 5, 2015.

[17] *Id*.

[18] Complaint, docket no. 2-2, filed Apr. 23, 2014.

[19] *Id*. ¶ 2.

[20] *Id*. (citing 29 U.S.C. § 1003(b)(1)), Hartford's Answer ¶ 2, docket no. 5, filed Apr. 30, 2014.

2015.[21] On May 1, 2015, the parties filed response memoranda,[22] and on May 18, 2015, the

parties filed reply memoranda.[23] Oral argument was heard on June 23, 2015.[24]

## UNDISPUTED FACTS

This collection of Undisputed Facts is distilled from the parties' summary judgment

briefing. Hartford's Motion provided a statement of background facts and a statement of

elements which refers generally to the background facts.[25] Williams's Motion also provided a

statement of elements followed by a factual background.[26] Williams's Response stated that "[t]he

parties have conferred about the resolution of this case, have agreed that this case should be

decided on the evidence of record, and that there is no material dispute about any facts in this

case."[27] In Hartford's Response, it agreed that "there is no dispute about any material fact in this

case."[28] Hartford also submitted the administrative record[29] and a CD of video surveillance.[30]

The parties' statements of facts did not comply with DUCivR 56-1(b)(2)(C), which

requires:

> Under each element, a concise statement of the material facts necessary to meet
> that element as to which the moving party contends no genuine issue exists....
> Each asserted fact must be presented in an individually numbered paragraph that

---

[21] Hartford's Motion, docket no. 17; Williams's Motion, docket no. 18.

[22] Hartford's Response, docket no. 19; Williams's Response, docket no. 20.

[23] Plaintiff's Reply to Hartford's Response Memorandum in Opposition to Williams' Motion for Summary Judgment ("Williams's Reply"), docket no. 21; Hartford's Reply, docket no. 22.

[24] Minute Order, docket no. 24, entered June 23, 2015.

[25] Hartford's Motion at 2-23, docket no. 17, filed Mar. 31, 2015.

[26] Williams's Motion at 5-14, docket no. 18, filed Mar. 31, 2015.

[27] Williams's Response at 2, docket no. 21, filed May 1, 2015.

[28] Hartford's Response at 4, docket no. 19, filed May 1, 2015.

[29] Administrative Record, docket nos. 14-1 through 14-14, filed Mar. 5, 2015.

[30] Hartford's Notice of Conventional Filing of Video Surveillance CD, docket no. 15, filed Mar. 6, 2015.

cites with particularity the evidence in the record supporting each factual assertion.[31]

On June 18, 2015, an email was sent to counsel with a summary set of undisputed facts incorporating the parties' filings and complying with the local rule. That summary was reviewed at the start of the June 23, 2015 hearing.[32] This collection of undisputed facts was finalized based on discussion at the hearing.[33] The headings in these Undisputed Facts are descriptive, not declaratory or substantive, and are taken from the elements of a claim for breach of contract.

## Breach of Contract Claim Element 1: Existence of a Contractual Duty

**The Plan and Group Policy Provisions**

1.     This case arises under the Utah School Boards Association Group Benefit Plan (the "Plan"),[34] Group Policy No. GLT-034943 ("Group Policy"), issued by Hartford to the Utah School Boards Association in order to fund the Plan's LTD benefits.[35]

2.     The Plan and Group Policy provide LTD benefits to eligible employees of the Utah School Boards Association, including the Sevier School District.[36]

3.     Benefits paid under the Group Policy are equal to $66^{2/3}\%$ of a claimant's Pre-Disability Earnings, reduced by Other Income Benefits as defined by the Plan and Group Policy.[37]

---

[31] DUCivR 56-1(b)(2)(C).

[32] Minute Order, docket no. 24, entered June 23, 2015.

[33] *Id.*

[34] Administrative Record at 1-48, docket no. 14-1, filed Mar. 5, 2015.

[35] *Id.* at 6, 37, docket no. 14-1.

[36] *Id.* at 6, docket no. 14-1.

[37] *Id.* at 6, 13, docket no. 14-1.

4.    Benefits are payable under the terms of the Plan and Group Policy when:

    1.  [The participant] become[s] Disabled while insured under th[e] Plan;
    2.  [The participant is] disabled throughout the Elimination Period;
    3.  [The participant] remain[s] Disabled [90 days] beyond the Elimination Period;
    4.  [The participant is], and ha[s] been during the elimination Period, under the Regular Care of a Physician; and
    5.  [The participant] submit[s] Proof of Loss satisfactory to [Hartford].[38]

5.    The Plan defines "Disability" or "Disabled" as:

[D]uring the Elimination Period and for the next 24 months, [the participant is] prevented by:

    1.  accidental bodily injury;
    2.  sickness;
    3.  Mental Illness;
    4.  Substance Abuse; or
    5.  Pregnancy,

from performing one or more of the Essential Duties of [the participant's own] Occupation, and as a result [the participant's] Current Monthly Earnings are no more than 80% of [the participant's] Indexed Pre-disability Earnings.

After that, [the participant] must be so prevented from performing one or more of the Essential Duties of Any Occupation.[39]

6.    The Plan defines "Essential Duty" as:

[A] duty that:

    1.  is substantial, not incidental;
    2.  is fundamental or inherent to the occupation; and
    3.  cannot be reasonable omitted or changed.

To be at work for the number of hours in [the participant's] regularly scheduled workweek is also an Essential Duty.[40]

7.    The Plan defines "Any Occupation" as:

[A]n occupation for which [the participant is] qualified by education, training or experience, and that has an earnings potential greater than the amount equal to the lesser of the product of [the participant's] Indexed

---

[38] *Id.* at 10, docket no. 14-1.

[39] *Id.* at 29, docket no. 14-1.

[40] *Id.*

Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.[41]

8.      Certain conditions are excluded from coverage under the Plan and Group Policy:

**Are there any other limitations on coverage?**

No benefit will be payable under the [P]lan for a Disability that is due to, contributed to by, or results from a Pre-existing Condition[.][42]

**What Disabilities are not covered?**

The [P]lan does not cover, and no benefit shall be paid for any Disability:

1. unless [the participant is] under the Regular Care of a Physician;
2. that is caused or contributed to by act of war (declared or not);
3. caused by [the participant's] commission of or attempt to commit a felony, or to which a contributing cause was [the participant] being engaged in an illegal occupation; or
4. caused or contributed to by an intentionally self inflicted injury.

If you are receiving or are eligible for benefits for a Disability under a prior disability [P]lan that:

1. was sponsored by the Employer, and
2. was terminated before the Effective Date of this [P]lan, no benefits will be payable for the Disability under this [P]lan.[43]

9.      A claimant for LTD benefits must submit a Proof of Loss.[44]

10.     The Proof of Loss includes documentation about the basis for the claim, including, among other things, the cause of the disability and "any and all medical information[.]"[45]

11.     The Proof of Loss "must be satisfactory" to Hartford.[46] Hartford is authorized to "request Proof of Loss throughout [a claimant's] Disability."[47]

---

[41] *Id.* at 28, docket no. 14-1.

[42] *Id.* at 19, docket no. 14-1.

[43] *Id.* at 21, docket no. 14-1.

[44] *Id.* at 24, docket no. 14-1.

[45] *Id.*

[46] *Id.*

[47] *Id.* at 25, docket no. 14-1.

12.     Based on Williams's age at the time of her claim for LTD benefits, her maximum period of LTD benefits would be her normal retirement age of 66.[48]

13.     However, the Plan provides that LTD benefits will end on the date when a claimant is "no longer Disabled as defined."[49]

14.     The Plan and Group Policy govern the "[f]inal interpretation of all provisions and coverages."[50]

**Breach of Contract Claim Element 2: Performance of the Contract by Williams**

**Proof of Loss**

15.     In March 2011, Williams was employed by the Sevier School District as a Third Grade teacher and therefore a participant under the Plan.[51]

16.     Williams's last day of work for the Sevier School District was March 29, 2011,[52] after which she submitted a claim for LTD benefits under the Plan.[53]

17.     Pursuant to the terms of the Plan and Group Policy, Williams applied for LTD benefits alleging disability beginning in March 2011.[54]

18.     On July 6, 2011, Hartford received Williams's claim for LTD benefits.[55] The application for LTD benefits contained information from Williams, Williams's employer, and Williams's treating physicians.[56]

---

[48] *Id.* at 7-8, docket no. 14-1.

[49] *Id.* at 11, docket no. 14-1.

[50] *Id.* at 6, docket no. 14-1.

[51] *Id.* at 1195, 1197, docket no. 14-12.

[52] *Id.* at 1195, docket no. 14-12.

[53] *Id.* at 1195-1210, docket no. 14-12 and docket no. 14-13.

[54] *Id.*

[55] *Id.* at 188 (July 6, 2011), docket no. 14-2. According to Hartford, the Summary Detail Report documents all of Hartford's actions relating to the administration of Williams's claim, including, among other things, the transmittal

19.     Williams based her disability claim on "[p]ain and limited mobility in [her] right hip & leg – lower back pain."[57]

20.     Williams offered proof of her disability satisfying the policy's definition of "Disability."[58]

**Breach of Contract Claim Element 3: Breach of the Contract by Hartford Williams's LTD Claim**

21.     Williams's family doctor, Dr. Dwight Inouye, completed an Attending Physician's Statement of Functionality ("APS") dated April 25, 2011.[59]

     a.     Dr. Inouye listed Williams's primary diagnoses as osteoarthritis of the right hip with a secondary diagnosis of hyperthyroidism.[60]

     b.     Dr. Inouye indicated that Williams could not engage in prolonged sitting, standing, and bending.[61]

22.     Dr. Alan Colledge, Williams's orthopedist, completed an APS dated May 5, 2011.[62]

---

and receipt of correspondence, Hartford's telephone conversations with Williams and others, Hartford's plan of action, and Hartford's analysis of the evidence. The Summary Detail Report appears in the Administrative Record at 49-188, docket no. 14-1 and docket no. 14-2. Multiple entries appear on many of the pages of the Summary Detail Report. In citations to the Summary Detail Report, the date of the cited entry is indicated parenthetically. When more than one entry with the same date appears on a page, the time of the cited entry is provided to distinguish it from other entries of the same date on the cited page. Due to space considerations, not all of Hartford's actions concerning Williams's claim, which the Summary Detail Report documents, are summarized.

[56] *Id.* at 1195-1210, docket no. 14-12 and docket no. 14-13.

[57] *Id.* at 1197, docket no. 14-12.

[58] *Id.* at 24, docket no. 14-1, 371-80, docket no. 14-4, 550, docket no. 14-6, 1000-01, docket no. 14-10 and docket no. 14-11.

[59] *Id.* at 1203-05, docket no. 14-13.

[60] *Id.* at 1203, docket no. 14-13.

[61] *Id.* at 1205, docket no. 14-13.

[62] *Id.* at 1209-10, docket no. 14-13.

    a.     Dr. Colledge indicated Williams's primary diagnoses as degenerative disk disease and osteoarthritis in the hip with a secondary diagnosis of hypothyroidism.[63]

    b.     Dr. Colledge reported that, among other things, Williams was capable of sitting up to 30 minutes at a time up to 8 hours with breaks, and standing for 20 minutes at a time up to 2 hours with breaks.[64]

23.    On July 15, 2011, Hartford summarized the information received with Williams's LTD claim.[65]

    a.     Hartford found that "[b]ased on the medical documentation, the [restrictions and limitations] appear reasonable and prevent [Williams] from performing her own occ[upation] throughout and beyond the [Elimination Period.]"[66]

    b.     Hartford noted that "[Williams] has a progressive condition which appears to be more tolerable while not working (standing/walking) however, it appears that she can perform sed[entary]/light work with changing of position."[67]

    c.     Hartford decided to approve LTD benefits for Williams through May 2012.[68]

    d.     Hartford also decided to refer the file to one of its vocational rehabilitation specialists for review "as it appears that [Williams] has at least sed[entary]/light work capacity."[69]

---

[63] *Id*. at 1209, docket no. 14-13.

[64] *Id*. at 1210, docket no. 14-13.

[65] *Id*. at 186-87 (July 15, 2011), docket no. 14-2.

[66] *Id*. at 187 (July 15, 2011), docket no. 14-2.

[67] *Id.*

[68] *Id.*

[69] *Id.*

e.      Hartford noted that "it is likely that [Williams] will not remain disabled

throughout and beyond" the time of the change to the "Any Occupation" definition.[70]

24.     On July 15, 2011, Hartford informed Williams of its initial claim determination

that her claim for LTD benefits was approved.[71]

25.     Hartford summarized the Plan's terms applicable to Williams's continued receipt

of LTD benefits and informed Williams that the "Any Occupation" definition would take effect

on June 13, 2013.[72]

**Hartford's Administration of Williams's LTD Claim After the Initial Approval**

26.     On September 7, 2011, a Hartford Rehabilitation Case Manager interviewed

Williams by telephone.[73]

27.     Williams stated that she had undergone surgery and treatment for thyroid cancer.[74]

Williams told the Rehabilitation Case Manager that her cancer treatments had prevented medical

treatment on her hip, and that she probably would need additional surgery for her

parathyroidism.[75]

28.     On September 7, 2011, the Rehabilitation Case Manager provided her

recommendations based on the telephone interview with Williams.[76]

---

[70] *Id.* The abbreviation "TC" in Hartford's Summary Detail Report refers to the change of the applicable "Disability" definition from focusing on a claimant's own occupation to the "Any Occupation" definition.

[71] *Id.* at 345-48, docket no. 14-4.

[72] *Id.*

[73] *Id.* at 183-84 (Sept. 7, 2011 3:54:31 p.m.), docket no. 14-2. A Rehabilitation Case Manager is an on-staff specialist with training relating to the assessment of vocational and vocational rehabilitation issues.

[74] *Id.* at 184 (Sept. 7, 2011 3:54:31 p.m.), docket no. 14-2.

[75] *Id.*

[76] *Id.* at 183 (Sept. 7, 2011 4:15:07 p.m.), docket no. 14-2.

29.     The Rehabilitation Case Manager closed the file from a vocational rehabilitation perspective for the time being because of the need for Williams's additional medical issues to be addressed.[77]

30.     The Rehabilitation Case Manager recommended obtaining updated medical records, and left open the possibility of considering vocational rehabilitation again in the future based on the status of Williams's treatment.[78]

31.     On September 22, 2011, Hartford's assigned Ability Analyst contacted Williams by telephone.[79]

        a.      The Ability Analyst and Williams discussed the status of Williams's medical condition and functionality.[80]

        b.      The Ability Analyst explained the change to the "Any Occupation" definition.[81] Williams stated that she "hope[d] to [return to work] in some capacity in the future," but did not "expect to [return to work in her] own occ[upation]."[82]

32.     On September 24, 2011, the Ability Analyst summarized her conclusions about the status of Williams's claim.[83]

        a.      She found that it "remains reasonable that [Williams] is unable to perform her own occ[upation] as a teacher due to the prolonged/walking standing required."[84]

---

[77] *Id.*

[78] *Id.*

[79] *Id*. at 181-82 (Sept. 22, 2011), docket no. 14-2.

[80] *Id.*

[81] *Id*. at 182 (Sept. 22, 2011), docket no. 14-2.

[82] *Id.*

[83] *Id*. at 181 (Sept. 24, 2011), docket no. 14-2.

[84] *Id.*

     b.     The Ability Analyst indicated that she would follow up after Williams's surgery to re-evaluate whether Williams continued to be disabled.[85]

33.     On September 29, 2011, the Ability Analyst's Manager reviewed and agreed with the Ability Analyst's assessment.[86]

34.     On November 18, 2011, the Ability Analyst again called Williams to check on her status.[87]

     a.     Williams reported that she was still waiting to be released for hip surgery.[88] Williams stated that she had received a diagnosis of fibromyalgia.[89]

     b.     The Ability Analyst told Williams that "the restrictions we have for her hip while disabling for her occ[upation] allow for sedentary work."[90]

35.     On November 18, 2011, the Ability Analyst summarized her plan of action on Williams's claim in light of her telephone conversation with Williams.[91]

     a.     She outlined the information received from Williams and expressed her view that Williams "does not appear to be medically stable yet."[92]

     b.     The Ability Analyst noted that she would seek updated medical information.[93]

---

[85] *Id.*

[86] *Id.* at 180-81 (Sept. 29, 2011), docket no. 14-2.

[87] *Id.* at 179-80 (Nov. 18, 2011 12:10:30 p.m.), docket no. 14-2.

[88] *Id.*

[89] *Id.* at 180 (Nov. 18, 2011 12:10:30 p.m.), docket no. 14-2.

[90] *Id.*

[91] *Id.* at 178-79 (Nov. 18, 2011 12:50:26 p.m.), docket no. 14-2.

[92] *Id.* at 178 (Nov. 18, 2011 12:50:26 p.m.), docket no. 14-2.

[93] *Id.* at 179 (Nov. 18, 2011 12:50:26 p.m.), docket no. 14-2.

      c.      The Ability Analyst stated that "[o]nce [Williams] is stable medically, [we] will need to determine her limitations for possible referral to rehab."[94]

36.     On November 21, 2011, the Ability Analyst's Manager summarized the future course of action regarding the claim based on the latest conversation with Williams.[95]

      a.      The Manager indicated that she had requested updated medical information "to clarify [Williams's] functionality."[96]

      b.      The Manager also noted that it would call Williams about issues relating to Social Security Disability Insurance ("SSDI") benefits.[97]

37.     On December 22, 2011, the Ability Analyst called Williams for an update on her condition.[98]

38.     On December 23, 2011, the Ability Analyst recorded her conclusions and plan based on her conversation with Williams.[99]

      a.      The Ability Analyst felt that the evidence continued to support Williams not being able to perform the duties of her own occupation as a teacher.[100]

      b.      The Ability Analyst indicated that she would "[c]ontinue to monitor [Williams's] condition[s] and surgery."[101]

---

[94] *Id.*

[95] *Id*. at 179 (Nov. 21, 2011), docket no. 14-2.

[96] *Id.*

[97] *Id.*

[98] *Id*. at 174-75 (Dec. 22, 2011), docket no. 14-2.

[99] *Id*. at 173-74 (Dec. 23, 2011), docket no. 14-2.

[100] *Id*. at 174 (Dec. 23, 2011), docket no. 14-2.

[101] *Id.*

39.     Dr. Inouye completed another APS dated December 2, 2011.[102]

a.      Dr. Inouye changed Williams's primary diagnoses to fibromyalgia and right hip degeneration.[103]

b.      Dr. Inouye also added a secondary diagnosis of parathyroid ademma.[104]

c.      Dr. Inouye indicated that Williams was capable to sitting up to 4-5 hours per day, standing 1-2 hours per day, and walking up to 20 minutes.[105]

d.      Dr. Inouye reported that Williams did not have any psychiatric or cognitive impairment.[106]

e.      Dr. Inouye reported that Williams could not "participate in vocational rehabilitation services[,]" including "worksite accommodations, identifying alternative work, and or retraining assistance[.]"[107]

40.     By a letter dated December 6, 2011, Hartford requested additional information from Dr. Inouye.[108]

a.      Hartford noted that Dr. Inouye's functional restrictions and limitations for Williams "would appear to allow [Williams] to work at least part time capacity."[109]

b.      Hartford requested information to support Dr. Inouye's statement that Williams was incapable of participating in vocational rehabilitation.[110]

---

[102] *Id*. at 1238-39, <u>docket no. 14-13</u>.

[103] *Id*. at 1238, <u>docket no. 14-13</u>.

[104] *Id.*

[105] *Id*. at 1239, <u>docket no. 14-13</u>.

[106] *Id.*

[107] *Id.*

[108] *Id*. at 340-41, <u>docket no. 14-4</u>.

[109] *Id*. at 341, <u>docket no. 14-4</u>.

[110] *Id.*

41.     On December 27, 2011, Hartford's Ability Analyst had two telephone conversations with Williams about the need for a response from Dr. Inouye, and Williams said that Dr. Inouye would not be in the office until her next office visit on January 3, 2012. [111]

42.     On December 30, 2012, the Hartford Team Leader, who supervised the Ability Analyst assigned to Williams's claim, summarized the status of Hartford's claim review, noting that Hartford would continue to seek updated information from Dr. Inouye, and that it was "unclear why [Williams] is unable to participate in [vocational rehabilitation]." [112]

43.     On January 8, 2012, Hartford sent a second request by fax to Dr. Inouye asking him "to clarify why [Williams] cannot participate in [vocational rehabilitation] within [the restrictions and limitations] provided on [his] prior APS" and requesting updated medical records. [113]

44.     On January 11, 2012, Dr. Inouye sent his response to Hartford. [114]

    a.     Dr. Inouye described Williams as "very weak and fatigues very easily[.]" [115]

    b.     Dr. Inouye stated that Williams had "chronic pain (moderate to severe)" which was "probably fibromyalgia." [116]

---

[111] *Id*. at 173 (Dec. 27, 2011 2:09:55 p.m.; Dec. 27, 2011 5:04:52 p.m.).

[112] *Id*. at 173 (Dec. 30, 2011), docket no. 14-2.

[113] *Id*. at 172 (Jan. 8, 2012), docket no. 14-2.

[114] *Id*. at 1146-70, docket no. 14-12.

[115] *Id*. at 1146, docket no. 14-12.

[116] *Id.*

      c.      Dr. Inouye reported that Williams used a wheelchair on "any prolonged trips."[117]

      d.      Dr. Inouye added that Williams "is not a malingerer in any way."[118]

45.      On January 19, 2012, the Ability Analyst recorded her assessment of the information received from Dr. Inouye and summarized Dr. Inouye's characterization of Williams's condition.[119]

      a.      The Ability Analyst indicated that she would refer the file to a Medical Care Manager ("MCM") "to determine if the [restrictions and limitations] as provided on the APS are supported and prevent [Williams] from even participating in [vocational rehabilitation]."[120]

      b.      The Ability Analyst also decided to refer the file to Hartford's Investigation Unit, because Williams's "reported activity does not appear to be consistent with [Dr. Inouye's] note of req[uired] sitting down after 100 [feet] or less of walking, or use of wheelchair."[121]

46.      On January 24, 2012, the MCM reported on her review of the medical records that Hartford had received from Williams's medical providers.[122] The MCM found:

> insufficient medicals during the life of the claim to make an accurate functional assessment at this time. There is a gap in time between 4/25/11 to 10/24/11… when there are no medicals from Dr. Inouye ([Family

---

[117] *Id.*; *but see id.* at 1231, docket no. 14-13 (Apr. 9, 2012 interview of Williams in which she denied using any assistive devices).

[118] *Id.* at 1146, docket no. 14-12.

[119] *Id.* at 171-72 (Jan. 19, 2012 10:55:10 a.m.), 171 (Jan. 19, 2012 10:56:56 a.m.), docket no. 14-2.

[120] *Id.* at 172 (Jan. 19, 2012 10:55:10 a.m.), docket no. 14-2. An MCM is an on-staff nurse who assists Hartford's claim personnel with the review of medical records.

[121] *Id.* at 171 (Jan. 19, 2012 10:55:56 a.m.), docket no. 14-2.

[122] *Id.* at 169-70 (Jan. 24, 2012 3:00:25 p.m.), docket no. 14-2.

Physician]) likely due to referral to Dr. Susan Maturlo (Endocrinology).
Medicals needed to further clarify [Williams's] cancerous endocrine
conditions, surgical involvement [with] need for radiation [treatment] and
prognosis. Missing are Dr. [Richard] Jackson (Ortho[pedist]) medicals as
appears per Dr. Inouye ([Family Physician]) this is [Williams's] current
[treating] ortho[pedist] who may consider scoping [Williams's] right
hip.[123]

47.    The MCM returned the file to the Ability Analyst in order to obtain additional

medical records.[124]

    a.    The Ability Analyst promptly followed up with Williams to obtain the

contract information for her endocrinologist, Dr. Maturlo, and orthopedist, Dr.

Jackson.[125]

    b.    The Ability Analyst then contacted Dr. Jackson and Dr. Maturlo to obtain

their records on Williams.[126]

    c.    The Ability Analyst also requested updated medical records from Dr.

Colledge, Dr. Inouye, and Dr. Jeffrey Wallentine.[127]

    d.    Multiple requests were necessary before Hartford received the requested

medical records from Williams's doctors.[128]

48.    On January 23 and 24, 2012, Triad Investigations, Inc. ("Triad") conducted video

surveillance of Williams's activities at the request of Hartford.[129]

---

[123] *Id*. at 170 (Jan. 24, 2012 3:00:25 p.m.), docket no. 14-2.

[124] *Id.*

[125] *Id*. at 169 (Jan. 27, 2012 4:30:41 p.m.; Jan. 27, 2012 5:17:50 p.m.; Jan. 31, 2012 6:06:07 p.m.), docket no. 14-2.

[126] *Id*. at 168-69 (Jan. 31, 2012 6:07:56 p.m.; Jan. 31, 2012 6:08:47 p.m.), docket no. 14-2, 335-38, docket no. 14-4.

[127] *Id*. at 164 (Apr. 10, 2012), 166-67 (Mar. 22, 2012 4:31:51 p.m., Mar. 22, 2012 12:56:53 p.m.), docket no. 14-2, 319-33, docket no. 14-4.

[128] *Id*. at 146-62, docket no. 14-2, 298-99, docket no. 14-3, 301-08, 310-18, docket no. 14-4.

[129] *Id*. at 1226 (video surveillance CD), docket no. 14-13, 1300-25 (Triad's written report), docket no. 14-14.

49.     On March 7 and 8, 2012, Triad conducted a second video surveillance of Williams.[130]

50.     On April 19, 2012, a Hartford Field Investigator, Mike Morrell, interviewed Williams at her home.[131]

    a.      In discussing her level of functionality, Williams said that various activities caused pain, but Williams denied needing any "special equipment."[132]

    b.      Mr. Morrell observed that Williams "was stable upon her feet and she stood without support[,]" and that "[w]hile viewing the functionality videos, [she] stood for the entire 20 minutes it took to view the videos."[133]

    c.      Even though Williams "mentioned that many normal movements or body functions cause her a lot of pain[, she] never spontaneously complained of fatigue in [Mr. Morrell's] presence, and she did not display any objective signs of fatigue in [Mr. Morrell's] presence."[134]

    d.      Williams "did not display any objective signs of cognitive impairment, confusion, inability to concentrate, or lack of focus in [Mr. Morrell's] presence."[135]

    e.      Williams viewed and commented on the surveillance video.[136]

    f.      Williams "noted that the things she did on the videos caused her a lot of pain, and we couldn't see that."[137]

---

[130] *Id.* at 1226 (video surveillance CD), docket no. 14-13, 1326-38 (Triad's written report), docket no. 14-14.

[131] *Id.* at 1229-35 (Mr. Morrell's report), 1250-91 (transcript of interview), docket no. 14-13.

[132] *Id.* at 1231, docket no. 14-13.

[133] *Id.*

[134] *Id.* at 1232, docket no. 14-13.

[135] *Id.*

[136] *Id.* at 1234-35, docket no. 14-13.

      g.     Williams later sent a letter dated April 25, 2012, to Mr. Morrell in which she provided further comments on her activities during the video surveillance.[138]

51.     By a letter dated April 27, 2012, Williams sent a new APS to Hartford, which Dr. Inouye had completed.[139]

      a.     Dr. Inouye indicated that Williams could sit for 30 minutes at a time with breaks and changes of position for 4-6 hours.[140]

      b.     Dr. Inouye opined that Williams could stand for 30 minutes at a time with breaks and changes of position for a total of 2 hours.[141]

      c.     Dr. Inouye stated that Williams's degree of functionality "depends on [the] day[.]"[142]

52.     On July 10, 2012, the Ability Analyst summarized the medical and investigative evidence in Williams's file,[143] noting that he would refer the file to an "MCM to review medical records, surveillance investigation findings and interview statement to help clarify [Williams's] current restrictions and limitations and her ability to return to work in [her] Own Occupation."[144]

53.     On August 9, 2012, the MCM reported on her assessment of the file materials and provided a detailed summary of the evidence.[145]

---

[137] *Id*. at 1235, docket no. 14-13.

[138] *Id*. at 1008-09, docket no. 14-11.

[139] *Id*. at 999-1001, docket no. 14-10 and docket no. 14-11.

[140] *Id*. at 1000, docket no. 14-10.

[141] *Id*.

[142] *Id*.

[143] *Id*. at 143-45 (July 10, 2012 2:03:02 p.m.), docket no. 14-2.

[144] *Id*. at 145 (July 10, 2012 2:03:02 p.m.), docket no. 14-2.

[145] *Id*. at 140-42 (Aug. 9, 2012 8:58:38 a.m.), docket no. 14-2.

      a.     The MCM stated that the medical evidence "could support some degree of discomfort secondary to the underlying inflammatory processes however the findings do not support an impairment to function, nor the severe limitation to function as reported by [Dr. Inouye]." [146]

      b.     The MCM felt that "[Williams's] observed activities and time away from home are in contrast to her self-reported limitations of walking 5 minutes and standing for 15–20 then needing to rest." [147]

      c.     The MCM had learned from Dr. Jackson's office that Williams had undergone a surgical procedure on her hip, but the office "could not confirm [the] specific procedure nor were they able to locate any activity restrictions." [148]

      d.     The MCM reported that additional medical information was necessary in order to determine Williams's functionality. [149]

54.     On September 11, 2012, Hartford received and reviewed Dr. Jackson's medical records, showing that Williams had a right hip arthroscopy on June 11, 2012. [150] Dr. Jackson reported that as of July 31, 2012, Williams was "doing well[.]" [151]

55.     On September 14, 2012, the MCM provided an updated assessment of Williams's medical records. [152]

---

[146] *Id*. at 142 (Aug. 9, 2012 8:58:38 a.m.), docket no. 14-2.

[147] *Id.*

[148] *Id.*

[149] *Id.*

[150] *Id*. at 137 (Sept. 11, 2012 10:20:20 a.m.; Sept. 11, 2012 1:07:32 p.m.), docket no. 14-2.

[151] *Id*. at 137 (Sept. 11, 2012 1:07:32 p.m.), docket no. 14-2.

[152] *Id*. at 133-36 (Sept. 14, 2012), docket no. 14-2.

a.      The MCM confirmed that Williams did not have future appointments scheduled with Dr. Jackson.[153]

b.      The MCM noted that she would contact Dr. Inouye and Dr. Jackson "for clarification of [Williams's] function[ality]."[154]

c.      The MCM stated that "[i]n light of the successful hip procedure [the] MCM [is] anticipating improvement in overall capabilities, less reported pain and no findings to support an inability to perform the sit/stand/walk activity required of a teacher."[155]

d.      The MCM also indicated that Hartford would send the video surveillance to Dr. Inouye and Dr. Jackson for their review and comment.[156]

56.    Hartford decided that it needed an additional opinion "to clarify/update [Williams's] current maximum functional abilities[,]" and contemplated scheduling an independent medical examination ("IME") by an orthopedic specialist.[157]

a.      However, Hartford learned that there were "no orthopedic IME providers within 78 miles of [Williams's home]."[158]

b.      Hartford concluded that the available IME providers were too far away from Williams's home to require her participation in an IME, and therefore, decided to arrange for a physician peer review of Williams's claim.[159]

---

[153] *Id*. at 136 (Sept. 14, 2012), docket no. 14-2.

[154] *Id*.

[155] *Id*.

[156] *Id*.

[157] *Id*. at 130 (Oct. 10, 2012), docket no. 14-2.

[158] *Id*. at 129 (Oct. 11, 2012 10:14:08 p.m.), docket no. 14-2.

[159] *Id*.

57.     On October 12, 2012, Hartford referred Williams's file to a third party vendor, BMI, in order to obtain an independent peer review.[160]

       a.     Hartford requested that the peer reviewer opine about Williams's level of functionality based on the medical evidence and other information provided.[161]

       b.     Hartford also asked the peer reviewer to "observe and note any consistencies/inconsistencies in comparing the subjective and objective findings versus the level of activity as seen in the surveillance [video]."[162]

58.     Dr. Robert Green, a Board Certified Orthopedic Surgeon, licensed to practice medicine in Florida, performed the peer review of Williams's claim for BMI and provided a report dated November 1, 2012.[163]

       a.     Dr. Green spoke with Dr. Inouye.[164]

           i.     Dr. Inouye stated that Williams's "main problem is fibromyalgia[.]"[165]

           ii.     Dr. Inouye noted that surgery had addressed Williams's hyperparathyroidism and right hip pathology, and that surgery on the left hip was scheduled.[166]

           iii.     Dr. Inouye expressed his view that Williams is incapable of "return[ing] to the workforce in any capacity" due to fibromyalgia.[167]

---

[160] *Id*. at 869-70, docket no. 14-9.

[161] *Id*. at 870, docket no. 14-9.

[162] *Id*.

[163] *Id*. at 864-68, docket no. 14-9.

[164] *Id*. at 865, docket no. 14-9.

[165] *Id*.

[166] *Id*.

b.        Dr. Green also spoke with Dr. Jackson who felt that Williams "certainly can return to a sedentary-type job as far as her hips are concerned, especially after she has the other hip [surgery] if he finds it necessary after doing an MRI and working her up." [168]

c.        Dr. Green concluded that fibromyalgia was "a limiting factor[.]" [169]

d.        Dr. Green opined that Williams "should be able to start at four hours a day or 20 hours a week" with limitations relating to lifting, stooping, squatting, pushing, and pulling. [170]

e.        Dr. Green noted that "[i]t is possible that [Williams] may eventually be able to increase the amount of time per day she is able to function." [171]

59.        On November 8, 2012, the MCM reviewed and summarized Dr. Green's report. [172]

a.        The MCM returned the file for continued administration. [173]

b.        The MCM identified Williams's primary diagnosis as osteoarthritis with a secondary diagnosis of fibromyalgia. [174]

60.        On December 21, 2012, the Ability Analyst reviewed the status of Williams's claim. [175]

a.        The Ability Analyst noted Dr. Green's opinion that Williams had the capacity to return to part-time sedentary work. [176]

---

[167] *Id.*

[168] *Id.* at 866, docket no. 14-9.

[169] *Id.* at 867, docket no. 14-9.

[170] *Id.*

[171] *Id.* at 867-68, docket no. 14-9.

[172] *Id.* at 125-26 (Nov. 8, 2012 9:41:17 a.m.), docket no. 14-2.

[173] *Id.* at 126 (Nov. 8, 2012 9:41:17 a.m.), docket no. 14-2.

[174] *Id.*

[175] *Id.* at 121-22 (Dec. 21, 2012 12:03:15 p.m.), docket no. 14-2.

b. The Ability Analyst also indicated that it was "not clear if [Williams] will regain enough capability to do full time sedentary work by [the effective date of the Plan's "Any Occupation" definition]."[177]

c. The Ability Analyst documented his plan to begin the investigation of whether Williams would continue to be disabled under the Plan's "Any Occupation" definition.[178]

**Hartford's Any Occupation Investigation**

61. On December 21, 2012, the Ability Analyst took several actions to begin the investigation of whether Williams would continue to be disabled under the Plan's "Any Occupation" definition.[179]

a. The Ability Analyst sent a letter to Williams informing her that the Plan's "Any Occupation" definition would take effect on June 17, 2013.[180]

b. The Ability Analyst summarized the applicable terms of the Plan and requested updated information.[181]

c. The Ability Analyst also sent letters to Williams's physicians requesting updated information.[182]

d. The Ability Analyst also sent a letter to Williams requesting her assistance in obtaining the updated records from Dr. Inouye and Dr. Jackson.[183]

---

[176] *Id*. at 122 (Dec. 21, 2012 12:03:15 p.m.), docket no. 14-2.

[177] *Id.*

[178] *Id.*

[179] *Id*. at 120 (Dec. 21, 2012), 121 (Dec. 21, 2012 4:29:35 p.m.), docket no. 14-2, 245-55, docket no. 14-3.

[180] *Id*. at 253-55, docket no. 14-3.

[181] *Id.*

[182] *Id*. at 120 (Dec. 21, 2012), docket no. 14-2, 245-50, docket no. 14-3.

   e. The Ability Analyst also interviewed Williams by telephone regarding her medical condition.[184]

62. On January 4, 2013, the Ability Analyst's Manager reviewed the issues relating to the Any Occupation investigation.[185]

   a. Based on the information received from Williams's treating physicians and Dr. Green's the independent peer review, the Manager noted that Williams's "return to part time sedentary functionality would be anticipated around [January to February 2013]" if the scheduled November 16, 2012 surgery on her left hip occurred.[186]

   b. The Manager indicated that the claim would be transferred to a new Ability Analyst with a specialty appropriate to Williams's conditions.[187]

   c. The Manager recommended obtaining Dr. Jackson's latest office visit notes in order to evaluate "if functionality has returned to [part-time] or [full-time] sedentary levels."[188]

63. On January 30, 2013, the new Ability Analyst documented the status of the Any Occupation investigation and summarized the information received and information still needed.[189]

---

[183] *Id*. at 251-52, docket no. 14-3.

[184] *Id*. at 121 (Dec. 21, 2012 4:29:35 p.m.), docket no. 14-2.

[185] *Id*. at 119 (Jan. 4, 2013 2:03:31 p.m.), docket no. 14-2.

[186] *Id*.

[187] *Id*.

[188] *Id*.

[189] *Id*. at 110-13 (Jan. 30, 2013), docket no. 14-2.

      a.     The Ability Analyst stated that "[o]nce we receive all [medical records], it appears an IME would be the most appropriate step to confirm that [restrictions and limitations] are supported."[190]

      b.     The Ability Analyst noted that Williams "has been participating in [part-time work], so it appears that [she] would have had improvement in functionality greater than part-time sed[entary] work."[191]

      c.     The Ability Analyst outlined a planned future course of conduct in the Any Occupation investigation.[192]

64.    On February 19, 2013, the Ability Analyst summarized the information on file regarding Williams's claim in anticipation of a "Roundtable" discussion.[193]

65.    On February 21, 2013, the Manger and the Ability Analyst had a "Roundtable" discussion of Williams's claim.[194]

      a.     The Manager and the Ability Analyst decided to "refer [Williams's file] to [the] MCM to clarify what is impacting functionality with regards to finger/handle and reaching."[195]

      b.     The Manager noted that Dr. Inouye had "not really addressed the objective testing to validate these limitation[s]."[196]

---

[190] *Id*. at 112 (Jan. 30, 2013), docket no. 14-2.

[191] *Id*.

[192] *Id*. at 113 (Jan. 30, 2013), docket no. 14-2.

[193] *Id*. at 104-06 (Feb. 19, 2013 5:00:24 p.m.), docket no. 14-2.

[194] *Id*. at 104 (Feb. 21, 2013), docket no. 14-2.

[195] *Id*.

[196] *Id*.

      c.      The Ability Analyst would ask the MCM "whether any change in functionality would be expected from the past peer review," and "if no change in functionality would be expected and restrictions [are] reasonable," the Analyst Ability would refer Williams's file for an Employability Analysis Report.[197]

66.     On February 22, 2013, the Ability Analyst referred Williams's file to the MCM.[198]

67.     On February 28, 2013, the MCM reported on her review of Williams's file.[199]

      a.      The MCM summarized the medical evidence.[200]

      b.      The MCM noted that she would contact Dr. Inouye in an attempt to clarify Williams's functionality.[201]

      c.      The MCM observed that "[i]t is possible that [Williams] may have had some increases in her functionality since the prior peer review [of Dr. Green] was performed."[202]

68.     On February 20, 2013, the MCM sent a fax to Dr. Inouye requesting clarification of Williams's functionality.[203]

69.     On March 7, 2013, the MCM contacted Dr. Inouye's office to follow up on the request, and resent the request.[204]

---

[197] *Id.*

[198] *Id.* at 102-04 (Feb. 22, 2013), [docket no. 14-2](#).

[199] *Id.* at 99-100 (Feb. 28, 2013 3:12:55 p.m.), [docket no. 14-1](#).

[200] *Id.*

[201] *Id.* at 100 (Feb. 28, 2013 3:12:55 p.m.), [docket no. 14-1](#).

[202] *Id.*

[203] *Id.* at 99 (Feb. 28, 2013 3:34:01 p.m.), [docket no. 14-1](#).

[204] *Id.* at 95-96 (Mar. 7, 2013), [docket no. 14-1](#).

70.     On March 14, 2013, the MCM again contacted Dr. Inouye's office to confirm receipt of the request.[205]

71.     On March 21, 2013, the MCM reported that she had not yet received a response from Dr. Inouye to her request seeking classification of Williams's functionality.[206]

  a.     The MCM indicated that she would discuss with the Ability Analyst about whether to refer Williams's file to a peer review vendor "to further clarify functionality of any occ[upation]."[207]

  b.     The Ability Analyst agreed with the plan to refer Williams's file "for peer review as we have not received response from [Dr. Inouye] to clarify [restrictions and limitations]."[208]

72.     On April 2, 2013, Hartford referred the file to a third party vendor, MES Solutions, in order to obtain a new independent medical peer review[209] and sent letters to Dr. Inouye and Dr. Jackson notifying them to expect a telephone call from the independent medical consultant.[210]

73.     MES Solutions assigned the peer review to Dr. Siva Ayyar, who is Board Certified in Occupational Medicine and has licenses to practice medicine in California, Florida, Ohio, Tennessee, and Texas.[211]

---

[205] *Id.* at 94 (Mar. 14, 2013), docket no. 14-1.

[206] *Id.* at 93-94 (Mar. 21, 2013), docket no. 14-1.

[207] *Id.* at 94 (Mar. 21, 2013), docket no. 14-1.

[208] *Id.* at 92-93 (Mar. 28, 2013; Mar. 25, 2013), docket no. 14-1.

[209] *Id.* at 582-83, docket no. 14-6.

[210] *Id.* at 212-13, docket no. 14-3.

[211] *Id.* at 581, docket no. 14-6.

74.     Dr. Ayyar submitted a detailed report dated April 24, 2013.[212]

a.      Dr. Ayyar left voice mail messages for Dr. Inouye, but the calls were not returned.[213]

b.      Dr. Ayyar was able to speak with Dr. Jackson.[214]

i.      Dr. Jackson reported that Williams's "hip issues have essentially been treated to resolution."[215]

ii.     Dr. Jackson told Dr. Ayyar that "[h]e is not a proponent of [Williams's] LTD claim."[216]

iii.    Dr. Jackson suggested that Dr. Ayyar contact Dr. Joseph Richey, who was treating Williams's low back pain.[217]

c.      Dr. Ayyar noted that Dr. Jackson "affirmed [his] conclusion that the hip issues were a temporarily limiting concern, as opposed to a continuously limiting concern."[218]

d.      Dr. Ayyar summarized the medical records.[219]

e.      Dr. Ayyar stated that Williams would not have been able to perform any work for two weeks immediately following her hip surgery on November 16, 2012.[220]

---

[212] *Id.* at 576-81, docket no. 14-6.

[213] *Id.* at 576, docket no. 14-6.

[214] *Id.*

[215] *Id.*

[216] *Id.*

[217] *Id.*

[218] *Id.*

[219] *Id.* at 576-79, docket no. 14-6.

[220] *Id.* at 579, docket no. 14-6.

f.      Dr. Ayyar identified restrictions and limitations relating to the post-operative recovery period, "December 1, 2012 to March 31, 2013[.]"[221]

g.      Dr. Ayyar indicated that he lacked sufficient medical evidence to extend the restrictions and limitations beyond April 1, 2013.[222]

h.      Dr. Ayyar stated that the nature of Williams's "functional, technical, and/or anatomic outcomes" would determine what, if any, restrictions and limitations would be appropriate after April 1, 2013.[223]

75.     On April 25, 2013, the MCM reviewed and summarized Dr. Ayyar's report[224] and sent a letter to Dr. Inouye asking Dr. Inouye to review the summary and provide any comments and remarks.[225]

76.     On April 25, 2013, the MCM also called Dr. Inouye's office in order to confirm receipt of her letter dated April 25, 2013.[226]

77.     On April 30, 2013, the Ability Analyst spoke with Williams about the status of the claim review.[227]

a.      The Ability Analyst informed Williams of Dr. Ayyar's conclusions, and that Hartford was awaiting Dr. Inouye's comments.[228]

---

[221] *Id.* at 579-80, docket no. 14-6.

[222] *Id.* at 580, docket no. 14-6.

[223] *Id.*

[224] *Id.* at 87-89 (Apr. 25, 2013 5:11:13 p.m.), docket no. 14-1.

[225] *Id.* at 209-11, docket no. 14-3.

[226] *Id.* at 87 (Apr. 25, 2013 5:28:13 p.m.), docket no. 14-1.

[227] *Id.* at 85 (Apr. 30, 2013 11:06:10 a.m.), docket no. 14-1.

[228] *Id.*

      b.     Williams asked whether her receipt of SSDI benefits played a role in Hartford's determination.[229]

      c.     The Ability Analyst explained that "the SSA and Hartford have different definitions of disability and different ways to make a decision[,]" and that Hartford "do[es] not make [its] decision based on [the] SSA[']s decision."[230]

78.     On May 1, 2013, Williams again spoke with the Ability Analyst.[231]

      a.     Williams discussed her referral to Dr. Richey regarding her back pain and said that she was scheduled to see him on May 7, 2013, regarding the results of an MRI.[232]

      b.     Williams asked whether Hartford considered her "whole health condition[.]"[233]

      c.     The Ability Analyst responded that Hartford "would take into consideration [the] totality of all medical condition[s]."[234]

      d.     Williams stated that Dr. Inouye disagreed with Dr. Ayyar, and that he would provide a response.[235]

      e.     Based on her conversation with Williams, the Ability Analyst noted that she would seek the records of Dr. Jackson and Dr. Richey referenced by Williams.[236]

---

[229] *Id.* On September 24, 2012, the Social Security Administration ("SSA") approved the payment of SSDI benefits to Williams. *Id.* at 872-77, docket no. 14-9.

[230] *Id.* at 85 (Apr. 30, 2013 11:06:10 a.m.), docket no. 14-1.

[231] *Id.* at 83-84 (May 1, 2013 2:25:25 p.m.), docket no. 14-1.

[232] *Id.* at 83 (May 1, 2013 2:25:25 p.m.), docket no. 14-1.

[233] *Id.*

[234] *Id.* at 83-84 (May 1, 2013 2:25:25 p.m.), docket no. 14-1.

[235] *Id.* at 84 (May 1, 2013 2:25:25 p.m.), docket no. 14-1.

[236] *Id.* at 83 (May 1, 2013 2:35:32 p.m.), docket no. 14-1.

f.      The Ability Analyst commented that "Hartford will need this information as it could potentially change [the Any Occupation] decision."[237]

79.     Dr. Inouye responded to the MCM's letter by letter dated April 30, 2013.[238]

a.      Dr. Inouye provided a short overview of Williams's diagnoses.[239]

b.      Dr. Inouye neither addressed any specific points in Dr. Ayyar's report nor cited any medical evidence supporting his opinions.[240]

c.      Instead, Dr. Inouye generally attacked the ability of a peer review physician to comment on Williams's medical condition.[241]

d.      Dr. Inouye reiterated his opinion that Williams "is disabled currently[, and that s]he cannot in any way continue to work as a teacher."[242]

80.     On May 8, 2013, the MCM documented her review of Dr. Inouye's response,[243] noting that he had not provided "additional medical records… for further review."[244]

81.     On May 9, 2013, Williams and the Ability Analyst spoke about Williams's recent visit with Dr. Richey.[245]

a.      The Ability Analyst noted that Hartford was continuing its review of whether Williams would continue to be disabled after June 17, 2013, under the "Any Occupation" definition.[246]

---

[237] *Id.*

[238] *Id.* at 561-64, docket no. 14-6.

[239] *Id.* at 564, docket no. 14-6.

[240] *Id.*

[241] *Id.*

[242] *Id.*

[243] *Id.* at 81-82 (May 8, 2013), docket no. 14-1.

[244] *Id.* at 82 (May 8, 2013), docket no. 14-1.

[245] *Id.* at 79-80 (May 9, 2013 2:57:10 p.m.), docket no. 14-1.

b.      Williams expressed her view that her back condition would prevent her from doing any type of work.[247]

c.      The Ability Analyst told Williams that she would need to review the medical information from Dr. Richey.[248]

82.      On May 15, 2013, the Ability Analyst received a letter from Williams and medical records from Dr. Jackson and Dr. Richey, and forwarded the new materials to the MCM.[249]

83.      On May 15, 2013, Williams called the Ability Analyst to tell her that additional medical information would be available the following week.[250] Hartford and Williams had follow up telephone conversations about the status of those materials.[251]

84.      On May 21, 2013, Hartford received the additional medical records, and the Ability Analyst referred them to the MCM for review.[252]

85.      The MCM reviewed the additional medical records and recommended their referral to Dr. Ayyar for an addendum review.[253]

86.      Hartford then referred the additional medical records to MES Solutions for an addendum review.[254]

---

[246] *Id*. at 80 (May 9, 2013 2:57:10 p.m.), docket no. 14-1.

[247] *Id*.

[248] *Id*.

[249] *Id*. at 77-78 (May 15, 2013 12:59:27 p.m.), docket no. 14-1.

[250] *Id*. at 77 (May 15, 2013 3:27:30 p.m.), docket no. 14-1.

[251] *Id*. at 74 (May 20, 2013 5:23:49 p.m.; May 20, 2013 5:31:50 p.m.), 76 (May 17, 2013 3:49:21 p.m.), docket no. 14-1.

[252] *Id*. at 73-74 (May 21, 2013 11:25:51 a.m.), docket no. 14-1.

[253] *Id*. at 72-73 (May 21, 2013 3:21:49 p.m.), docket no. 14-1.

[254] *Id*. at 475-77, docket no. 14-5.

87.     On June 4, 2013, Dr. Ayyar submitted an addendum report.[255]

     a.     Dr. Ayyar again tried to speak with Dr. Inouye, but was unsuccessful.[256]

     b.     Dr. Ayyar reviewed and summarized the 101 pages of new information.[257]

     c.     Dr. Ayyar found evidence of fatigue attributable to Williams's hypothyroidism and recommended some activity limitations for the period of May 6, 2013 to June 6, 2013, to allow a month for adjustment of Williams's hypothyroidism medication.[258]

     d.     Dr. Ayyar stated that Williams's hip condition may "cause intermittent limitations and restrictions."[259]

     e.     Dr. Ayyar found no evidence to support restrictions or limitations attributable to Williams's back condition, citing the fact that the lumbar MRI was "essentially negative[.]"[260]

     f.     Dr. Ayyar found that "[Williams's] thyroid cancer has seemingly been treated to resolution[.]"[261]

88.     On June 6, 2013, the Ability Analyst sent a letter to Dr. Inouye summarizing the findings in Dr. Ayyar's addendum report,[262] and referred the file for the preparation of an Employability Analysis Report.[263]

---

[255] *Id*. at 462-66, docket no. 14-5.

[256] *Id*. at 462, docket no. 14-5.

[257] *Id*. at 462-64, docket no. 14-5.

[258] *Id*. at 464-65, docket no. 14-5.

[259] *Id*. at 465, docket no. 14-5.

[260] *Id*.

[261] *Id*.

[262] *Id*. at 206-07, docket no. 14-3.

[263] *Id*. at 457-58, docket no. 14-5.

89.     On June 11, 2013, Sandra Shelton, MA, CRC prepared an Employability Analysis Report for Hartford,[264] based on the limitations offered by Dr. Ayyar and on the June 6, 2013 report of MCM-RN Michelle McNamara.[265]

a.     According to the Employability Analysis Report, Ms. Shelton considered the following limitations:

> sit unlimited; stand/walk no more than 15 minutes continuously for total of 30 cumulative minutes per hour, maximum of 4 cumulative hours per day; lift up to 25 [pounds] up to 3 cumulative [hours] per day, up to 26 [pounds] or more up to 30 cumulative minutes per day; occasionally kneel, squat, bend or stoop maximum of 2 [hours] per day; activity not formally limited above should be considered unlimited. Ms. Williams is able to perform Sedentary demands 8 hours per day, 40 hours per week. There is no evidence to support cognitive and/or mental restrictions.[266]

b.     Ms. Shelton "identified 6 occupations within the Closest level; no occupations within the Good level; 77 occupations within the Fair level; and 205 occupations within the Potential level[,]" and provided a "representative sample of occupations that meet [Williams's] profile[.]"[267]

c.     Ms. Shelton opined that Williams could perform work as a Teacher, Elementary School—Williams's past occupation; Teacher, Mentally Impaired; Teacher, Vocational Training; and Teacher, Learning Disabled.[268]

d.     Ms. Shelton also opined Williams could perform work as a Jacket Preparer, which was categorized as a "Potential" level occupation.[269] According to the

---

[264] *Id*. at 444-55, docket no. 14-5.

[265] *Id*. at 444, docket no. 14-5.

[266] *Id*.

[267] *Id*. at 445, docket no. 14-5.

[268] *Id*. at 446, docket no. 14-5.

[269] *Id*.

Employability Analysis Report's Transferability Table, a "Potential" level occupation has low transferability, requiring plan development and training, and training in tools and materials is required.[270]

    e.    Ms. Shelton stated that "[e]ach occupation is within the restrictions/limitations provided by Dr. Ayyar."[271]

    f.    Ms. Shelton also stated that the job of Jacket Preparer "requires no experience or education" and "can be performed with short on-the-job training" despite its classification as a "Potential" level occupation.[272]

90.    On June 13, 2013, Hartford informed Williams of its determination that she was "not Disabled from [her own] Occupation effective [June 12, 2013] and will not be Disabled from Any Occupation as of [June 17, 2013]."[273]

    a.    Hartford acknowledged that Williams had received SSDI benefits, but stated that "[t]he standards governing these public and private benefits are different in critical ways."[274]

    b.    Hartford indicated that it had considered "the SSA's disability determination as one piece of relevant evidence," but added that "the SSA's determination is not conclusive."[275]

    c.    Hartford went on to summarize the relevant terms of the Plan and the information it considered.[276]

---

[270] *Id*. at 450, docket no. 14-5.

[271] *Id*. at 446, docket no. 14-5.

[272] *Id*.

[273] *Id*. at 204, docket no. 14-3.

[274] *Id*. at 199, docket no. 14-2.

[275] *Id.*

d.      Hartford determined that the payment of LTD benefits to Williams would end on June 12, 2013.[277]

e.      According to the termination, Williams could perform her own occupation as a Teacher, Elementary School, as well as other occupations, listed as: Teacher, Mentally Impaired; Teacher; Vocational Training; Teacher, Learning Disabled; and Jacket Preparer.[278]

**Hartford's Determination of Williams's Appeal**

91.      By a letter dated November 19, 2013, Williams's counsel submitted an appeal of the claim determination, arguing that Williams's medical records show that she has continuing problems with hypothyroidism, hip osteoarthritis, pain, and weakness.[279] Williams's counsel enclosed a Functional Capacity Evaluation,[280] as further proof of Williams's disability.[281]

92.      Hartford referred the file to a third party vendor, Reliable Review Services, for a new independent peer review.[282]

93.      Reliable Review Services assigned the peer review project to Dr. Joseph L. Rea, who is Board Certified in Occupational Medicine with licenses to practice medicine in Alabama and Texas.[283]

---

[276] *Id*. at 199-204, docket no. 14-2 and docket no. 14-3.

[277] *Id*. at 199, docket no. 14-2, 204, docket no. 14-3.

[278] *Id*. at 204, docket no. 14-3.

[279] *Id*. at 368-70, docket no. 14-4.

[280] *Id*. at 371-80, docket no. 14-4.

[281] *Id*. at 369, docket no. 14-4.

[282] *Id*. at 55 (Dec. 17, 2013), docket no. 14-2.

[283] *Id*. at 359, docket no. 14-4.

94.     Dr. Rea provided a report dated January 10, 2014.[284]

      a.      Dr. Rea summarized Williams's clinical history.[285]

      b.      Dr. Rea concluded that Williams should be capable of full-time work with various noted activity limitations from June 11, 2013, to the present.[286]

95.     On January 13, 2014, Hartford issued its determination on Williams's appeal.[287]

      a.      Hartford noted the arguments on which Williams based her appeal and summarized the conclusions of Dr. Rea.[288]

      b.      Hartford stated that "[a]lthough our previous decision was supported by the information we had at the time, we will reopen [Williams's] claim an extend benefits through [June 16, 2013,]"[289] an additional five days, after which it denied Williams's appeal.[290]

      c.      Hartford again concluded that "the medical information does not establish that [Williams] remained Disabled from performing [A]ny [O]ccupation as defined by the [Plan and Group P]olicy."[291]

      d.      Hartford found that "the weight of the information in [Williams's] file viewed as a whole supports that [she] is medically capable of performing at least full time

---

[284] *Id*. at 354-61, docket no. 14-4.

[285] *Id*. at 354-56, docket no. 14-4.

[286] *Id*. at 357-58, docket no. 14-4.

[287] *Id*. at 190-92, docket no. 14-2.

[288] *Id*. at 190-91, docket no. 14-2.

[289] *Id.* at 191, docket no. 14-2.

[290] *Id*. at 192, docket no. 14-2.

[291] *Id.*

sedentary work within the above noted limitations [of Dr. Rea] and that she is
vocationally employable at that work level."[292]

      e.    Dr. Rea opined that Williams could perform full-time work with the
following limitations:

> lifting/pulling/pushing/carrying up to 10 pounds occasionally;
> sitting for up to 30 minutes at a time for up to 6 hours of sitting
> over an 8 hour day; walking/standing up to 15 minutes at a time for
> up to 2 hours over an 8 hour day; occasional kneeling; no
> squatting/crawling/crouching/climbing; bending on a rare basis;
> and no limitations in
> reaching/fingering/handling/grasping/gripping.[293]

      f.    Hartford's denial letter also indicated that the June 11, 2013 Employability
Analysis Report determined that Williams "is vocationally employable in a sedentary
occupation."[294]

      g.    Hartford's denial letter stated that "[t]his is [Hartford's] final
determination on [Williams's] appeal and [that its] record is closed."[295]

### Breach of Contract Claim Element 4: Damages

**Initial Denial of Williams's Claim for LTD Benefits**

96.    On June 13, 2013, Hartford informed Williams of its determination that she was
"not Disabled from [her own] Occupation effective [June 12, 2013] and will not be Disabled
from Any Occupation as of [June 17, 2013]."[296]

---

[292] *Id.*

[293] *Id.* at 191, docket no. 14-2, 357-58, docket no. 14-4.

[294] *Id.* at 192, docket no. 14-2, 444, docket no. 14-5.

[295] *Id.* at 192, docket no. 14-2.

[296] *Id.* at 204, docket no. 14-3.

      a.     Hartford acknowledged that Williams had received SSDI benefits, but stated that "[t]he standards governing these public and private benefits are different in critical ways."[297]

      b.     Hartford indicated that it had considered "the SSA's disability determination as one piece of relevant evidence," but added that "the SSA's determination is not conclusive."[298]

      c.     Hartford went on to summarize the relevant terms of the Plan and the information it considered.[299]

      d.     Hartford determined that the payment of LTD benefits to Williams would end on June 12, 2013.[300]

      e.     According to the termination, Williams could perform her own occupation as a Teacher, Elementary School, as well as other occupations, listed as: Teacher, Mentally Impaired; Teacher; Vocational Training; Teacher, Learning Disabled; and Jacket Preparer.[301]

**Denial of Williams's Appeal**

97.     On January 13, 2014, Hartford issued its determination on Williams's appeal.[302]

      a.     Hartford noted the arguments on which Williams based her appeal and summarized the conclusions of Dr. Rea.[303]

---

[297] *Id*. at 199, docket no. 14-2.

[298] *Id*.

[299] *Id*. at 199-204, docket no. 14-2 and docket no. 14-3.

[300] *Id*. at 199, docket no. 14-2, 204, docket no. 14-3.

[301] *Id*. at 204, docket no. 14-3.

[302] *Id*. at 190-92, docket no. 14-2.

[303] *Id*. at 191-92, docket no. 14-2.

     b.     Hartford stated that "[a]lthough our previous decision was supported by the information we had at the time, we will reopen [Williams's] claim an extend benefits through [June 16, 2013,]"[304] an additional five days, after which it denied Williams's appeal.[305]

     c.     Hartford again concluded that "the medical information does not establish that [Williams] remained Disabled from performing [A]ny [O]ccupation as defined by the [Plan and Group P]olicy."[306]

     d.     Hartford found that "the weight of the information in [Williams's] file viewed as a whole supports that [she] is medically capable of performing at least full time sedentary work within the above noted limitations [of Dr. Rea] and that she is vocationally employable at that work level."[307]

     e.     Dr. Rea opined that Williams could perform full-time work with the following limitations:

> lifting/pulling/pushing/carrying up to 10 pounds occasionally; sitting for up to 30 minutes at a time for up to 6 hours of sitting over an 8 hour day; walking/standing up to 15 minutes at a time for up to 2 hours over an 8 hour day; occasional kneeling; no squatting/crawling/crouching/climbing; bending on a rare basis; and no limitations in reaching/fingering/handling/grasping/gripping.[308]

---

[304] *Id.* at 191, docket no. 14-2.

[305] *Id.* at 192, docket no. 14-2.

[306] *Id.*

[307] *Id.*

[308] *Id.* at 191, docket no. 14-2, 357-58, docket no. 14-4.

f.      Hartford's denial letter also indicated that the June 11, 2013 Employability

Analysis Report determined Williams is vocationally employable in a sedentary

occupation.[309]

g.      Hartford's denial letter stated that "[t]his is [Hartford's] final

determination on [Williams's] appeal and [that its] record is closed."[310]

### Summaries

### Summary of Medical Evidence[311]

98.     Williams has been diagnosed with fibromyalgia.[312]

a.      Dr. Inouye mapped 17 of 18 positive trigger points consistent with a

diagnosis of fibromyalgia.[313]

b.      Throughout her medical records, Williams's physicians have consistently

reported pain and fatigue due to fibromyalgia.[314]

---

[309] *Id*. at 192, docket no. 14-2, 444, docket no. 14-5.

[310] *Id*. at 192, docket no. 14-2.

[311] According to Williams, the Administrative Record contains voluminous medical records dating back over five years. As Williams was terminated from benefits effective June 2013, only those medical records and opinions leading up to Hartford's termination decision and while Williams's claim was on appeal are summarized herein, and only those relevant to the parties' arguments. There is also video surveillance that was filed conventionally by Hartford, docket no. 15, as well as a summary of Hartford's surveillance investigation found in the Administrative Record at 1245-1360, docket no. 14-13 and docket no. 14-14. As the surveillance efforts were never an apparent basis for Hartford's determination, they are not summarized.

[312] Administrative Record at 126 (Nov. 8, 2012 9:41:17 a.m.), 180 (Nov. 18, 2011 12:10:30 p.m.), docket no. 14-2, 865, 867, docket no. 14-9, 1146, docket no. 14-12, 1238, docket no. 14-13, filed Mar. 5, 2015.

[313] *Id*. at 680, docket no. 14-7; *see also* SSR 12-2p at 4.

[314] *See e.g.* Administrative Record at 381, docket no. 14-4 ("[Williams's] problems with fibro[myalgia] seem to be worsening. Her ability to move about and do things is very limited…. She appears very tired today."), 524, docket no. 14-6 ("[Williams's] fibromyalgia continues to be quite severe, [and] limits her activity. When she over exerts, she really pays for it…. Generally, [she] continues to suffer with fibromyalgia, she's very weakened. She continues to be unable to work. I believe this is a longstanding problem and that it will go on forever."), 675, docket no. 14-7 ("[T]here's no question in my mind that she has fairly significant fibromyalgia-type symptoms. She's not pretending that these symptoms are causing problems – they are definitely there."), filed Mar. 5, 2015.

99.     Williams has been diagnosed with degenerative joint disease of the hips.[315]

a.     On May 3, 2012, Dr. Jackson stated that he believed Williams "would benefit from an arthroscopic assessment evaluation" of her right hip, which was scheduled for June 13, 2012.[316]

b.     On June 13, 2012, Dr. Jackson performed arthroscopic surgery on Williams's right hip for a labral tear with femoral acetabular impingement.[317]

c.     On September 13, 2012, Dr. Jackson stated that Williams was doing "very, very well" post right hip arthroscopy, though her left hip had become "more and more symptomatic and more painful."[318]

d.     A left hip arthroscopy was planned for November 2012.[319]

e.     On November 16, 2012, Dr. Jackson performed arthroscopic surgery on Williams's left hip for a labral tear with cam and pincer deformity of the femoral acetabular impingement.[320]

f.     X-rays taken on December 20, 2012, "show[ed] quite an increase in the degenerative process that has been taking place."[321]

g.     Williams described pain in her hips not only when walking, but when sitting or at rest.[322]

---

[315] *Id*. at 1209, docket no. 14-13.

[316] *Id*. at 620, docket no. 14-7.

[317] *Id*. at 892-93, docket no. 14-9.

[318] *Id*. at 616, docket no. 14-7.

[319] *Id*.

[320] *Id*. at 622-23, docket no. 14-7.

[321] *Id*. at 614, docket no. 14-7.

[322] *Id*. at 522, docket no. 14-6.

       h.     On January 8, 2013, Dr. Jackson was encouraged that a total hip replacement could be avoided at the time, but noted that "it was probabl[y] inevitable that down the road [it] will be required."[323]

       i.     X-rays on September 13, 2013, revealed rapidly advancing degeneration of the right hip joint with end stage osteoarthritis, thus making Williams a candidate for a total hip replacement.[324]

100.    Dr. Richey diagnosed Williams with lumbar degenerative disc disease,[325] with a Lumbar MRI revealing mild degenerative changes,[326] but no isolated peripheral neuropathy.[327]

**Summary of Medical Opinions Regarding Williams's Restrictions and Limitations**

101.    On November 1, 2012, Dr. Green prepared a report for Hartford based on a review of Williams's claim file and the surveillance video taken of Williams at the direction of Hartford.[328]

       a.     Dr. Green did not examine Williams.[329]

       b.     Dr. Green concluded that Williams was currently limited to part-time work activity, though he did not rule out a return to full-time sedentary work in the future.[330]

       c.     Dr. Green concluded that based on a review of the records and surveillance video, there was no "symptom magnification" displayed.[331]

---

[323] *Id*. at 521, docket no. 14-6.

[324] *Id*. at 383, docket no. 14-4.

[325] *Id*. at 406, docket no. 14-5.

[326] *Id*. at 481, docket no. 14-5.

[327] *Id*. at 395, docket no. 14-4.

[328] *Id*. at 864-68, docket no. 14-9.

[329] *Id*.

[330] *Id*. at 867-68, docket no. 14-9.

[331] *Id*. at 868, docket no. 14-9.

102.    On April 24, 2013, Dr. Ayyar submitted a report to Hartford based on a review of Williams's claim file.[332]

    a.    Dr. Ayyar did not examine Williams.[333]

    b.    Dr. Ayyar stated that Williams's diagnoses were:

        Bilateral hip arthritis/bilateral hip impingement syndrome with a history of labral tearing, fibromyalgia/chronic pain syndrome, low back pain, headaches secondary to temporomandibular joint syndrome (TMJ), history of thyroid cancer with postoperative hypothyroidism and hypoparathyroidism status post thyroidectomy and parathyroidectomy, obstructive sleep apnea (OSA), and hemorrhoids.[334]

    c.    Despite Williams's diagnoses, Dr. Ayyar opined that she would have only temporary limitations related to surgery, and that her work capacity would be unlimited after April 1, 2013.[335]

103.    On May 7, 2013, Williams saw Dr. Richey for an evaluation of lumbar spine pain.[336]

    a.    Dr. Richey placed Williams on restrictions of:

        no lifting more than 25 pounds on an infrequent basis and no lifting more than 20 pounds on a frequent basis…. 20 minutes of walking, 20 minutes of sitting and 20 minutes of standing during each one hour period…. no repetitive bending, stooping, squatting, or pushing with respect to her lumbar spine.[337]

---

[332] *Id*. at 576-81, docket no.14-6.

[333] *Id*.

[334] *Id*. at 579, docket no. 14-6.

[335] *Id*. at 579-80, docket no. 14-6.

[336] *Id*. at 406-10, docket no. 14-5.

[337] *Id*. at 406, 408, docket no. 14-5.

      b.      Dr. Richey's restrictions were related only to Williams's lumbar spine impairment. [338]

      c.      While Dr. Richey did not believe surgery would be beneficial, he recommended that Williams "procure disability benefits if possible." [339]

104.    On May 10, 2013, in response to Dr. Ayyar's report, Dr. Inouye opined that Williams was unable to perform sedentary work on a part time basis. [340]

105.    In a letter dated April 30, 2013, Dr. Inouye explained that he had been treating Williams for 20 years, and that her health had declined over the past two years. [341]

      a.      After Williams had been treated for thyroid cancer, Dr. Inouye made a diagnosis of fibromyalgia based on Williams's muscle pain and severe weakness. [342]

      b.      Dr. Inouye went on to state:

> This patient has <u>never</u> been a malingerer in my extensive association with her and it seems to be "absurd" that the insurance company which is determining her disability; can hire a physician who has never seen the patient and never known the patient's circumstances and declare that the patient is no longer disabled. It's incredible to me that someone can do this to a person! I've recommended that the patient seek legal advice and get this adjudicated by someone other than the insurance company. I would also recommend to her that they ask for damages because this is an egregious farce that they're placing on this patient. I'm tired of filling-out their disability forms. <u>The patient is disabled currently. She cannot in any way continue to work as a teacher. When she exerts a little bit of activity at all, she's in bed the next day or so because of the severe weakness. This is an extreme example of</u>

---

[338] *Id.*

[339] *Id.* at 407, 409, <u>docket no. 14-5</u>.

[340] *Id.* at 547-48, <u>docket no. 14-6</u>.

[341] *Id.* at 550, <u>docket no. 14-6</u>.

[342] *Id.*

what an insurance company can do to a person. I believe it is unfair
and unjust![343]

106.    On May 21, 2013, Dr. Ayyar prepared an addendum to his April 24, 2013
report.[344]

      a.    Dr. Ayyar altered his opinion of Williams's restrictions and limitations,
"but only superficially."[345]

      b.    Dr. Ayyar opined that for a brief period, from May 6, 2013 through
June 6, 2013, Williams would have the following restrictions and limitations:

> Standing and walking are limited to no more than 15 minutes
> continuously maximum of 30 cumulative minutes per hour and
> maximum of four cumulative hours per an eitht-hour day; lifting
> limited to 25 pounds or less for up to 3 cumulative hours per 8-
> hour day.
>
> Lifting is limited to those articles weighing 25 or less for up to
> three cumulative hours per eight-hour day.
>
> Lifting of articles weighing 26 pounds or more should be limited to
> no more than 30 cumulative minutes per eight-hour day.
>
> Kneeling, squatting, bending, and/or stooping are limited to
> occasional and a maximum of two cumulative hours per eight-hour
> day.[346]

      c.    Dr. Ayyar stated that "[a]ny activity not formally limited above should be
considered unlimited. E.g., sitting is unlimited here."[347]

      d.    Dr. Ayyar's amended restrictions and limitations for the one-month period
were related only to Williams's thyroid impairment.[348]

---

[343] *Id*. (emphasis in original).

[344] *Id*. at 462-66, docket no. 14-5.

[345] *Id*. at 464, docket no. 14-5.

[346] *Id*. at 465, docket no. 14-5.

[347] *Id*.

[348] *Id*.

107.    On October 28, 2013, Williams underwent a Functional Capacity Evaluation secondary to fibromyalgia and bilateral hip pain with continued difficulty with mobility and pain affecting daily activities.[349]

a.    Occupational Therapist Marc Rosello performed a variety of tests on Williams, including validity testing.[350]

b.    Mr. Rosello stated that Williams "[a]ppeared to give full volitional effort" during testing, as objectified through validity testing.[351]

c.    Mr. Rosello noted that "[a]fter 5 minutes rest, [Williams's] ending heart rate was 123 beats per minute and 96% O2 saturation[, with a p]ain level was 7/10 in her right hip, back, shoulders and feet."[352]

d.    Mr. Rosello concluded that "[Williams] does not appear capable of performing work, even in the sedentary category, secondary to deconditioning, increasing pain and muscle weakness."[353]

108.    On January 4, 2014, Dr. Inouye prepared as assessment of Williams's work-related capabilities at the request of Hartford.[354]

a.    Dr. Inouye stated Williams's primary diagnoses were fibromyalgia and low back pain, with secondary diagnoses of hyperparathyroidism, sleep apnea, and irritable bowel syndrome.[355]

---

[349] *Id*. at 371-80, docket no. 14-4.

[350] *Id*.

[351] *Id*. at 380, docket no. 14-4.

[352] *Id*.

[353] *Id.*

[354] *Id*. at 708-09, docket no. 14-8.

[355] *Id*. at 708, docket no. 14-8.

b.      Among other restrictions and limitations, Dr. Inouye opined Williams

could only sit for a total of 2-3 hours per workday, stand for a total of 1 hour per

workday, and walk for a total of 1 hour per workday.[356]

c.      Thus, Dr. Inouye suggested restrictions and limitations that would

effectively allow Williams to work a maximum of about 4 hours per day.[357] This

represented a decrease in functioning from April 23, 2012, when Dr. Inouye completed

the same form for Hartford.[358] In the earlier form, Dr. Inouye suggested restrictions and

limitations that would effectively allow Williams to work potentially 7 hours per day,

depending on the amount of time she could sit during the day.[359]

109.    Dr. Rea reviewed Williams's claim file for Hartford and prepared a report dated

January 10, 2014.[360]

a.      Dr. Rea did not examine Williams.[361]

b.      Dr. Rea stated that:

> While fibromyalgia does not stand as an objective clinical entity
> (upon which impairment and resultant physical limitations can be
> based) and the degenerative low back spinal condition is not
> objectively significant, there is a more solid, objective
> underpinning for impairment stemming from advanced-level right
> hip osteoarthritis.[362]

---

[356] *Id*. at 709, docket no. 14-8.

[357] *Id*.

[358] *Id*. at 999-1000, docket no. 14-10.

[359] *Id*. at 1000, docket no. 14-10.

[360] *Id*. at 354-61, docket no. 14-4.

[361] *Id*.

[362] *Id*. at 357, 358, docket no. 14-4.

      c.     Dr. Rea opined that "[b]ased on the hip involvement," Williams would have the following restrictions:

> Lifting/pulling/pushing/carrying up to 10 pounds on an occasional basis[;]
>
> Sitting for up to 30 minutes at a time for up to 6 hours of sitting over an 8-hour day[;]
>
> Walking/standing up to 15 minutes at a time, for up to 2 hours of walking/standing over an 8-hour day[;]
>
> Kneeling on an occasional basis[;]
>
> No squatting, crawling, crouching, or climbing[;]
>
> Bending on a rare basis[;]
>
> There would be no limitations on reaching[; and]
>
> There would be no limitations for hand usage, such as fingering/handling/grasping/gripping.[363]

## STANDARD OF REVIEW

Generally, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[364] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way[,]"[365] or "if a reasonable jury could return a verdict for the nonmoving party."[366] In determining whether there is a genuine dispute of material fact, courts "examine the factual record and reasonable inferences therefrom in the light most favorably to the party opposing summary judgment."[367]

---

[363] *Id.*

[364] FED. R. CIV. P. 56(a).

[365] *Alder v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)

[366] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

[367] *Id.* (internal quotations omitted).

The moving party "bears the burden of showing the absence of a genuine issue of material fact[.]"[368] The movant "need not negate the nonmovant's claim, but need only point out to the district court that there is an absence of evidence to support the nonmoving party's case."[369] Upon such a showing, the nonmoving party "may not rest upon mere allegations or denials of his pleading, but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[370] "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[371]

However, this is not the usual summary judgment case. "The parties … conferred about the resolution of th[e] case, [and] agreed that th[e] case should be decided on the evidence of record, and that there is no material dispute about any facts in th[e] case."[372] "The sole issue is the interpretation of the evidence and the application of the law to the evidence of [record]."[373] Therefore, the parties "asked the [c]ourt to decide th[e] case based on the evidence submitted to the [c]ourt and the parties' summary judgment memoranda."[374] Accordingly, "this isn't just a summary judgment [proceeding] on two motions, but it is a stipulation to a record from which [the court] as the factfinder [will] decide the case."[375]

---

[368] *Id.* at 1529.

[369] *Id.* (internal quotations omitted).

[370] *Id.* (internal quotations and citations omitted; emphasis in original).

[371] *Id.* (internal quotations omitted).

[372] Williams's Response at 2, docket no. 20, filed May 1, 2015.

[373] *Id*.

[374] Hartford's Response at 1, docket no. 19 , filed May 1, 2015.

[375] Hearing Transcript at 3:24-4:1, docket no. 26, filed Jan. 6, 2017.

## DISCUSSION

"In Utah, a plaintiff may sue on a contract for: (1) breach of the contract's express terms; and/or (2) breach of the covenant of good faith and fair dealing, which is an implied duty that inheres in every contractual relationship."[376] Williams's Complaint asserts a single claim for breach of the Plan and Group Policy's express terms through the improper denial of her claim from LTD benefits.[377] Nevertheless, the majority of Hartford's arguments rest on principles relating to a claim for breach of the covenant of good faith and fair dealing, such as whether Hartford diligently investigated Williams's claim for LTD benefits, whether Williams's claim for LTD benefits was fairly debatable, and whether Hartford acted reasonably and promptly.[378] Hartford's arguments are irrelevant to Williams's claim for breach of the Plan and Group Policy's express terms.[379]

While appellate opinions include discussion analyzing both types of claims, claims for breach of express terms and breach of implied covenant of good faith and fair dealing are distinct and require different considerations and elements of proof.[380] "[T]he former claim is confined to the obligations imposed by the contract itself, [but] the latter is not so constrained."[381] The claim for breach of the implied covenant of good faith and fair dealing contemplates that "the insurer will diligently investigate the facts to enable it to determine where a claim is valid, will fairly

---

[376] *Blakely v. USAA Cas. Ins. Co.*, 633 F.3d 944, 947 (10th Cir. 2011).

[377] Complaint at 3-4, docket no. 2-2, filed Apr. 23, 2014.

[378] Hartford's Motion at 24-31, docket no. 17, filed Mar. 31, 2015; Hartford's Response at 4-6, 12, docket no. 19, filed May 1, 2015; Hartford's Reply at 2-5, docket no. 22, filed May 18, 2015.

[379] *Blakely*, 633 F.3d at 947; *Machan v. UNUM Life Ins. Co. of America*, 2005 UT 37, ¶¶ 17-21, 116 P.3d 342.

[380] *Id.* at 947-50; *Jones v. Farmers Ins. Exchange*, 2012 UT 52, ¶ 8, 286 P.3d 301; *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶¶ 25-29, 33-36, 56 P.3d 524; *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 466-69 (Utah 1996); *Beck v. Farmers Ins. Exchange*, 701 P.2d 795, 800-02 (Utah 1985); *see also Borandi v. USAA Cas. Ins. Co.*, 2014 WL 7369891, *4 (D. Utah 2014) (relying on *Jones*, 2012 UT 52).

[381] *Blakely*, 633 F.3d at 947.

evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim."[382] Therefore, Hartford's arguments relating to these principles lack merit and are not relevant Williams's allegations that Hartford breached the express terms of the Plan and Group Policy by denying her claim for LTD benefits.

The law relevant to the breach of a contract's express terms governs Williams's claim against Hartford. Under Utah law, "[t]he elements of a prima facie case for breach of [the express terms of a] contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[383] These elements are addressed in turn with respect to Williams's claim against Hartford.

### Hartford has a contractual duty to pay LTD benefits to Williams

The record evidence demonstrates, and there is no dispute among the parties, that a contract existed between Williams and Hartford. Williams was employed by the Sevier School District in Richfield, Utah as a Third Grade teacher until March 2011.[384] At all relevant times, the Utah School Boards Association had a Plan and Group Policy issued by Hartford in order to fund the Plan's LTD benefits.[385] The Plan and the Group Policy provide LTD benefits to eligible employees of the Utah School Boards Association, including the Sevier School District.[386] Therefore, as an employee of the Sevier School District, Williams was a participant in the Plan and covered by the Group Policy issued by Hartford.[387]

---

[382] *Id*. at 948; *Prince*, 2002 UT 68, ¶¶ 27-29, 33-36; *Morris v. Health Net of California, Inc.*, 1999 UT 95, ¶ 7, 988 P.2d 940; *Beck*, 701 P.2d at 800-01.

[383] *Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14, 20 P.3d 388.

[384] Administrative Record at 1195, 1197, docket no. 14-12, filed Mar. 5, 2015.

[385] *Id*. at 1-48, docket no. 14-1.

[386] *Id*. at 6, docket no. 14-1.

[387] *Id*. at 1-48, docket no. 14-1, 1195, 1197, docket no. 14-12.

The Plan and Group Policy govern the "[f]inal interpretation of all provisions and coverages."[388] LTD benefits are payable under the terms of the Plan and Group Policy when:

1. [The participant] become[s] Disabled while insured under th[e] Plan;
2. [The participant is] disabled throughout the Elimination Period;
3. [The participant] remain[s] Disabled [90 days] beyond the Elimination Period;
4. [The participant is], and ha[s] been during the elimination Period, under the Regular Care of a Physician; and
5. [The participant] submit[s] Proof of Loss satisfactory to [Hartford].[389]

The Plan and Group Policy, however, excludes coverage for "a Disability that is due to, contributed to by, or results from a Pre-existing Condition[.]"[390] Coverage is also excluded if the participant is receiving or eligible for benefits for a Disability under a prior disability plan.[391]

And no benefits are paid under the Plan for any Disability:

1. unless [the participant is] under the Regular Care of a Physician;
2. that is caused or contributed to by act of war (declared or not);
3. caused by [the participant's] commission of or attempt to commit a felony, or to which a contributing cause was [the participant] being engaged in an illegal occupation; or
4. caused or contributed to by an intentionally self inflicted injury.[392]

LTD benefits terminate on the date the participant is "no longer Disabled as defined" by the Plan.[393]

Therefore, Hartford owes Williams a contractual duty to pay LTD benefits to her if she has a qualifying Disability that is not excluded from coverage, became Disabled while insured under the Plan and Group Policy, remains Disabled, was and is under the Regular Care of a

---

[388] *Id*. at 6, docket no. 14-1.

[389] *Id*. at 10, docket no. 14-1.

[390] *Id*. at 19, docket no. 14-1.

[391] *Id*. at 21, docket no. 14-1.

[392] *Id*.

[393] *Id*. at 11, docket no. 14-1.

Physician, and has provided Hartford with satisfactory Proof of Loss.[394] Accordingly, the first element of Williams's breach of contract claim against Hartford is satisfied.

## Williams performed her duties under the Plan and Group Policy

**Williams properly applied for LTD benefits**

Williams's duties under the Plan and Group Policy required her to give Hartford or its authorized agent "written notice a [her] claim within 30 days after [her] Disability start[ed,]" or as soon as possible if the notice could not be given within that time.[395] Williams's notice was required to include her name, address, and the Group Policy number.[396] The record evidence undisputedly establishes that Williams submitted a written application for LTD benefits under the Plan and Group Policy following her last day of work for the Sevier School District.[397] Williams's application asserted that her last day of work before the disability was March 18, 2011,[398] and alleged that her disability was based on "[p]ain and limited mobility in [her] right hip & leg – lower back pain."[399] Hartford received the application on July 6, 2011.[400] The application contained all the information about Williams, Williams's employer, and Williams's treating physicians required by the Plan and Group Policy.[401] Therefore, Williams complied with her duty to apply for LTD benefits.

---

[394] *Id*. at 6, 10, 13, 19, 21, docket no. 14-1.

[395] *Id*. at 23, docket no. 14-1.

[396] *Id*.

[397] *Id*. at 1195-1210, docket no. 14-12 and docket no. 14-13.

[398] *Id*. at 1198, docket no. 14-12.

[399] *Id*. at 1197, docket no. 14-12.

[400] *Id*. at 188 (July 6, 2011), docket no. 14-2.

[401] *Id*. at 1195-1210, docket no. 14-12 and docket no. 14-13.

**Williams provided Hartford with timely and satisfactory Proof of Loss**

The Plan and Group Policy required Williams to provide timely and satisfactory Proof of Loss to Hartford.[402] Proof of Loss consists of forms provided by Hartford and "any other written proof which fully describes the nature and extent of [a] claim."[403] Proof of Loss includes, but is not limited to:

1. documentation of:
   a) the date [the] Disability began;
   b) the cause of [the] Disability;
   c) the prognosis of [the] Disability;
   d) [the claimant's] Earnings or income, including but not limited to copies of [the claimant's] filed and signed federal and state tax returns; and
   e) evidence that [the claimant is] under the Regular Care of a Physician;
2. any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;
3. the names and addresses of all:
   a) Physicians and practitioners of healing arts [the claimant has] seen or consulted;
   b) hospitals or other medical facilities in which [the claimant has] been seen or treated; and
   c) pharmacies which have filled [the claimant's] prescriptions within the past three years;
4. [the claimant's] signed authorization for [Hartford] to obtain and release:
   a) medical, employment and financial information; and
   b) any other information [Hartford] may reasonably require;
5. [the claimant's] signed statement identifying all Other Income Benefits; and
6. proof that [the claimant] and [the claimant's] dependents have applied for all Other Income Benefits which are available.[404]

---

[402] *Id*. at 24-25, docket no. 14-1.

[403] *Id*. at 24, docket no. 14-1.

[404] *Id*.

Williams was also required to provide additional Proof of Loss at the request of Hartford throughout her Disability, including her attendance and participation in additional examinations.[405]

The record evidence demonstrates that Williams provided Hartford with written Proof of Loss satisfying the Plan's "Proof of Loss" definition. Williams's family doctor, Dr. Inouye, completed an APS dated April 25, 2011, that was provided to Hartford with Williams's application for LTD benefits.[406] Williams's orthopedist, Dr. Colledge, completed an APS dated May 5, 2011, that was also provided to Hartford with Williams's application.[407] Based on the information within Williams's application for LTD benefits and the APS of her medical providers, Hartford initially approved Williams for LTD benefits through May 2012.[408]

In furtherance of her Proof of Loss, Williams participated in a telephonic interview with Harford's Rehabilitation Case Manager on September 7, 2011.[409] Williams also participated in telephonic interviews with Hartford's Ability Analyst on September 22, 2011,[410] November 18, 2011,[411] and December 22, 2011.[412] Dr. Inouye provided Hartford with a second APS dated December 2, 2011,[413] and follow-up information on January 11, 2012.[414] In late January 2012, Williams further provided Hartford with the contact information for her endocrinologist, Dr.

---

[405] *Id*. at 25, docket no. 14-1.

[406] *Id*. at 1203-06, docket no. 14-13.

[407] *Id*. at 1209-10, docket no. 14-13.

[408] *Id*. at 187 (July 15, 2011), docket no. 12-2, 345-47, docket no. 14-4.

[409] *Id*. at 183-84 (Sept. 7, 2011 3:54:31 p.m.), docket no. 14-2.

[410] *Id*. at 181-82 (Sept. 22, 2011), docket no. 14-2.

[411] *Id*. at 179-80 (Nov. 18, 2011), docket no. 14-2.

[412] *Id*. at 174-75 (Dec. 22, 2011), docket no. 14-2.

[413] *Id*. at 1238-39, docket no. 14-13.

[414] *Id*. at 1146-70, docket no. 14-12.

Maturlo, and orthopedist, Dr. Jackson, following Hartford's request for additional information.[415] Williams also participated in an interview with Hartford's Field Investigator on April 19, 2012,[416] and provided follow-up information by letter dated April 25, 2012.[417] Williams further provided Hartford with a third APS prepared by Dr. Inouye on April 27, 2012.[418] Dr. Jackson provided Hartford with Williams's updated medical records on September 11, 2012.[419] Williams also provided Hartford with proof that she had applied for and received an award of SSDI benefits from the SSA.[420] Williams's medical providers were also made available to speak with third party vendors performing peer reviews of Williams's medical records for Hartford.[421]

Additionally, Williams participated in telephonic interviews with Hartford's Ability Analyst on December 21, 2012, April 30, 2013, May 1, 2013, and May 9, 2013.[422] Ultimately, Williams continued to assist Hartford in obtaining additional information from Dr. Inouye, Dr. Jackson, and Dr. Richey until the denial of her claim.[423]

Based on the additional Proof of Loss Williams provided, Hartford extended the payment of LTD benefits to Williams through June 16, 2013.[424] Hartford's initial approval of LTD benefits for Williams and its extension of payment of LTD benefits to Williams demonstrate that

---

[415] *Id*. at 169 (Jan. 27, 2012 4:30:41 p.m.; Jan. 27, 2012 5:17:50 p.m.; Jan. 31, 2012 6:06:07 p.m.), docket no. 14-2.

[416] *Id*. at 1229-35 (Mr. Morrell's report), 1250-91 (transcript of interview), docket no. 14-13.

[417] *Id*. at 1008-09, docket no. 14-11.

[418] *Id*. at 999-1001, docket no. 14-10 and docket no. 14-11.

[419] *Id*. at 137 (Sept. 11, 2012 10:20:20 a.m.; Sept. 11, 2012 1:07:32 p.m.), docket no. 14-2.

[420] *Id*. at 85 (Apr. 30, 2013 11:09:02 a.m.), docket no. 14-1, 872-76, docket no. 14-9.

[421] *Id*. at 576, docket no. 14-6, 865-66, docket no. 14-9.

[422] *Id*. at 79-80 (May 9, 2013 2:57:10 p.m.), 83-84 (May 1, 2013 2:25:25 p.m.), 85 (Apr. 30, 2013 11:06:10 a.m.), docket no. 14-1, 121 (Dec. 21, 2012 4:29:35 p.m.), docket no. 14-2.

[423] *Id*. at 77-78 (May 15, 2013 12:59:27 p.m.), 83-84 (May 1, 2013 2:25:25 p.m.), docket no. 14-1, 199-204, docket no. 14-2 and docket no. 14-3, 561-64, docket no. 14-6.

[424] *Id*. at 191, docket no. 12-2.

Williams's Proof of Loss was timely and satisfactory to Hartford. There is no evidence suggesting that Williams failed to provide any of the necessary documentation regarding her disability claim, or that Williams failed to timely comply with any of Hartford's requests for additional Proof of Loss throughout the claims process. Indeed, Hartford's denial of Williams's claim was not due to her failure to provide satisfactory Proof of Loss, but rather its determination that "the medical information does not establish that [Williams] remained Disabled from performing [A]ny [O]ccupation as defined by the [Plan and Group P]olicy."[425]

Hartford nevertheless argues that Williams failed to provide satisfactory Proof of Loss.[426] Hartford premises its argument on its reading of the Plan's definition of "Proof of Loss," which requires that "[a]ll proof submitted must be satisfactory to [Hartford]."[427] In Hartford's view, Proof of Loss is only satisfactory when Hartford determines that a claimant is entitled to LTD benefits.[428] In other words, Hartford's view attempts to wrap the merits of Williams's contract claim into the Proof of Loss requirement. Hartford then maintains that because it diligently investigated Williams's claim and because its denial of the claim was reasonable, Williams failed to provide sufficient satisfactory Proof of Loss.[429]

Hartford's reading of the Plan, however, ignores the plain language of the Plan's definition of "Proof of Loss." The proper construction of the "Proof of Loss" definition is that the requirement is one of technical compliance through the submission of sufficient paperwork

---

[425] *Id*. at 192, docket no. 12-2.

[426] Hartford's Motion at 3, 24-31, docket no. 1, filed Mar. 31, 2015; Hartford's Response at 4-6, 12, docket no. 19, filed May 1, 2015.

[427] Administrative Record at 24, docket no. 14-1, filed Mar. 5, 2015.

[428] Hartford's Motion at 24-31, docket no. 17, filed Mar. 31, 2015; Hartford's Response at 4-6, 12, docket no. 19, filed May 1, 2015.

[429] Hartford's Motion at 24-31, docket no. 17, filed Mar. 31, 2015; Hartford's Response at 4-6, 12, docket no. 19, filed May 1, 2015.

and information to permit Hartford to render a determination on a claim.[430] The "Proof of Loss" definition does not render a claim insufficient based on Hartford's determination that a claimant does not have a Disability. The plain language of the "Proof of Loss" definition refers to the submission of information on forms provided by Hartford and other documentation demonstrating the basis for the claim and the cause of the claimed Disability.[431] In context, that Proof of Loss must be "satisfactory" to Hartford means that the information submitted to Hartford must be sufficient to enable Hartford to make a determination on a claim, and that Hartford may request additional documentation, information, and examinations to make its determination.[432] The ultimate successful outcome of the claim is determined by the Plan and Group Policy's terms of coverage and facts demonstrating a claimed Disability, not the Proof of Loss alone. Therefore, the Proof of Loss requirement is one of form, as opposed to a grant of discretion and deference to Hartford and its decision to approve or deny LTD benefits.[433]

This reading of the Plan and Group Policy's Proof of Loss requirement is support by the general principle that "[i]f a policy stipulates that 'satisfactory proof' shall be furnished, the insurer cannot demand proof other than what is reasonable and just, and ordinarily such a provision will be considered complied with when there has be furnished such proof as establishes the fact of the loss and of the right of the claimant to recover."[434] "An insurer has 'satisfactory

---

[430] Administrative Record at 24, docket no. 14-1, filed Mar. 5, 2015.

[431] *Id*.

[432] *Id*. at 24-25, docket no. 14-1.

[433] *Id*.

[434] 13 Couch on Ins. § 189:59 (3d ed. Dec. 2016 Update) (citing *Prudential Ins. Co. of America v. Litzke*, 36 Del. 592, 179 A. 492 (Super. Ct. 1934); *Barrett v. Northwestern Mut. Life Ins. Co.*, 124 Neb. 864, 248 N.W. 391 (1933)).

proof of loss,' where proof is sufficient to fully apprise [the] insurer of [the] insured's claim." [435]
This reading is also supported by Tenth Circuit precedent recognizing that "[a]s a general rule, a
proof of loss requirement is valid and may be considered as a condition precedent to recovery[,]"
but is a "technical policy requirement[.]" [436]

It is true that the Tenth Circuit has also interpreted nearly identical language to the
language within Plan's "Proof of Loss" definition as conveying discretion to a plan administrator
in finding the facts relating to disability. [437] However, this interpretation was made in the context
of a plan governed by ERISA, where the Tenth Circuit "[has] been comparatively liberal in
construing language to trigger the more deferential standard of review under ERISA." [438] The
Plan and Group Policy in this case is not governed by ERISA. [439] Rather, Williams's claim is for
breach of the express terms of the Plan and Group Policy, [440] and the interpretation of the Plan
and Group Policy is guided by general principles relating to the interpretation of insurance
contracts. [441] "Because 'an insurance policy is a classic example of an adhesion contract,' Utah
courts have long held that 'insurance policies should be construed liberally in favor of the
insured and their beneficiaries so as to promote and not defeat the purpose of insurance.'" [442]
Therefore, the liberal interpretation of a plan to afford insurer deference that applies in ERISA

---

[435] *Id*. (citing *Fontana v. Louisiana Sheriffs' Auto. Risk Program*, 697 So.2d 1037 (La. Ct. App. 1st Cir. 1997);
*Griswold Properties, LLC v. Lexington Ins. Co.*, 275 Mich. App. 543, 740 N.W.2d 659 (2007), opinion reinstated in
part, superseded in part on other grounds, 276 Mich. App. 551, 741 N.W.2d 549 (2007)).

[436] *Connecticut Fire Ins. Co. v. Fox*, 361 F.2d 1, 6 (10th Cir. 1966).

[437] *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1268 (10th Cir. 2002).

[438] *Id*.

[439] Complaint ¶ 2, docket no. 2-2, filed Apr. 23, 2014 (citing 29 U.S.C. § 1003(b)(1)), Hartford's Answer ¶ 2, docket
no. 5, filed Apr. 30, 2014

[440] Complaint, docket no. 2-2, filed Apr. 23, 2014.

[441] *Fire Ins. Exch. v. Oltmanns*, 2012 UT App 230, ¶ 6, 285 P.3d 802.

[442] *Id*. (quoting *United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d 519, 521-22 (Utah 1993)).

cases is contrary to the guiding policies that apply to the interpretation of the Plan and Group Policy in this case.

Additionally, Hartford's reading of the "Proof of Loss" definition attempts to shift the analysis of Williams's claim into principles of law governing a breach of the covenant of good faith and fair dealing.[443] These principles are not relevant to Williams's claim for a breach of the Plan and Group Policy's express terms.[444] If Hartford's reading of the "Proof of Loss" definition were correct, there would be no distinction between a claim for breach of the contract's express terms and a claim for beach of the covenant of good faith and fair dealing. This reading would create an identity of issues under each type of claim. The issues for both claims would be whether Hartford diligently investigated the claim and made a prompt and reasonable determination as to coverage. Under Hartford's analysis, it would not matter whether Hartford's decision ultimately violated the express terms of the Plan and Group Policy by incorrectly denying LTD benefits despite the claimant having a covered Disability. This analysis and result would defeat Williams's contractual rights and be contrary to the recognition of two distinct claims under contract: breach of the contract's express terms, and breach of the covenant of good faith and fair dealing.[445] Hartford's reading may also conflict with Utah's administrative rule "prohibit[ing] the use of reservation of discretion clauses in forms that are not associated with ERISA employee benefit plans."[446]

---

[443] Hartford's Motion at 24-31, docket no. 17, filed Mar. 31, 2015; Hartford's Response at 4-6, 12, docket no. 19, filed May 1, 2015.

[444] *Supra* at 54-55.

[445] *Blakely*, 633 F.3d at 947; *Machan*, 2005 UT 37, ¶¶ 17-21.

[446] Utah Admin. Code R590-218.

Therefore, in accordance with the Plan and Group Policy's plain language[447] and general principles of insurance contract interpretation,[448] Williams's requirement to provide Hartford with timely and satisfactory Proof of Loss is one of form, as opposed to a grant of discretion and deference to Hartford and its decision to approve or deny LTD benefits. Moreover, based on the information and documentation Williams provided to Hartford and her participation with and responses to Hartford's requests for additional Proof of Loss, Williams complied with her duty to provide Hartford with timely and satisfactory Proof of Loss.

**Williams was and is under the Regular Care of a Physician**

To receive LTD benefits under the Plan and Group Policy, Williams was required to be under the Regular Care of a Physician.[449] The Plan defines "Regular Care of a Physician" as:

[The participant is] attended by a Physician, who is not related to [the participant]:

1. with medical training and clinical experience suitable to treat [the participant's] disabling condition; and

2. whose treatment is:

    a) consistent with the diagnosis of the disabling condition;

    b) according to guidelines established by medical, research and rehabilitative organizations; and

    c) administered as often as needed,

to achieve the maximum medical improvement.[450]

The parties do not dispute that at all relevant times, Williams was under the Regular Care of a Physician. There is no evidence in the record that Williams failed to be under the Regular Care of a Physician. Rather, the record evidence reflects that Williams regularly visited multiple physicians to receive treatment for her various medical conditions, and that Williams's

---

[447] Administrative Record at 24-25, docket no. 14-1.

[448] *Fire Ins. Exch. v. Oltmanns*, 2012 UT App 230, ¶ 6, 285 P.3d 802.

[449] Administrative Record at 10, 21, docket no. 14-1, filed Mar. 5, 2015.

[450] *Id*. at 34, docket no. 14-1.

physicians prepared multiple APS that were provided to Hartford.[451] Therefore, Williams complied with her duty to be under the Regular Care of a Physician.

### Hartford breached its contractual duty to Williams by denying her claim for LTD benefits

Hartford owes Williams a contractual duty to pay LTD benefits to Williams if she has a qualifying Disability that is not excluded from coverage; became Disabled while insured under the Plan and Group Policy; remains Disabled; was and is under the Regular Care of a Physician; and provided Hartford with satisfactory Proof of Loss.[452] It has already been determined that Williams was and is under the Regular Care of a Physician,[453] and that she timely provided Hartford with satisfactory Proof of Loss.[454] Therefore, whether Hartford breached its contractual duty to pay LTD benefits to Williams turns on whether Williams has a qualifying Disability that is not excluded from coverage; became Disabled while insured under the Plan and Group Policy; and remains Disabled.

### Williams has a qualifying Disability that is not excluded from coverage and became Disabled while insured under the Plan and Group Policy

For purposes of an initial approval of LTD benefits payments, the Plan defines "Disability" or "Disabled" as:

> [D]uring the Elimination Period and for the next 24 months, [the participant is] prevented by:
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,

---

[451] *Id*. at 999-1001, docket no. 14-10 and docket no. 14-11, 1202-10, 1238-39, docket no. 14-13.

[452] *Supra* at 55-57.

[453] *Supra* at 65-66.

[454] *Supra* at 58-65.

from performing one or more of the Essential duties of [the participant's own] Occupation, and as a result [the participant's] Current Monthly Earnings are no more than 80% of [the participant's] Indexed Pre-disability Earnings.[455]

"Essential Duty" is defined under the Plan as:

> [A] duty that:
> 1. is substantial, not incidental;
> 2. is fundamental or inherent to the occupation; and
> 3. can not be reasonably omitted or changed.[456]

"To be at work for the number of hours in [the participant's] regularly scheduled workweek is also an Essential Duty."[457]

The Plan and Group Policy exclude coverage for "a Disability that is due to, contributed to by, or results from a Pre-existing Condition[.]"[458] Coverage is also excluded if the participant is receiving or eligible for benefits for a Disability under a prior disability plan, as well as for any Disability:

> 1. unless [the participant is] under the Regular Care of a Physician;
> 2. that is caused or contributed to by act of war (declared or not);
> 3. caused by [the participant's] commission of or attempt to commit a felony, or to which a contributing cause was [the participant] being engaged in an illegal occupation; or
> 4. caused or contributed to by an intentionally self inflicted injury.[459]

LTD benefits terminate on the date the participant is "no longer Disabled as defined" by the Plan.[460]

---

[455] Administrative Record at 29, docket no. 14-1, filed Mar. 5, 2015.

[456] *Id.*

[457] *Id.*

[458] *Id.* at 19, docket no. 14-1.

[459] *Id.* at 21, docket no. 14-1.

[460] *Id.* at 11, docket no. 14-1.

Williams applied for LTD benefits alleging disability from "[p]ain and limited mobility in [her] right hip & leg – lower back pain" beginning in March 2011.[461] Williams's family doctor, Dr. Inouye, made a primary diagnosis of osteoarthritis of the right hip with a secondary diagnosis of hyperthyroidism.[462] Williams's orthopedist, Dr. Colledge, made a primary diagnosis of degenerative disk disease and osteoarthritis in the hip with a secondary diagnosis of hypothyroidism.[463] Williams's doctors indicated that she could not engage in prolonged sitting, standing, and bending.[464]

There is no dispute that Williams became Disabled, as defined by the Plan, while insured under the Plan and Group Policy. There is also no dispute that Williams's Disability, including her diagnosis of fibromyalgia, does not fall within the exclusions to coverage identified in the Plan and Group Policy. And there is no dispute that Williams's Disability qualified her for LTD benefit payments throughout the Elimination Period and the next 24 months due to the restrictions and limitations caused by her Disability, which prevented her from performing one or more of the Essential Duties of her Occupation. The record evidence undisputedly establishes this by the fact that Hartford initially approved the payment of LTD benefits to Williams through May 2012.[465] Moreover, based on the Proof of Loss Williams provided to Hartford, which included her diagnosis of fibromyalgia, Hartford continued paying LTD benefits to Williams through June 16, 2013.[466]

---

[461] *Id*. at 1197-98, docket no. 14-12.

[462] *Id*. at 1203, docket no. 14-13.

[463] *Id*. at 1209, docket no. 14-13.

[464] *Id*. at 1205, 1210, docket no. 14-13.

[465] *Id*. at 187 (July 15, 2011), docket no. 14-2, 345-47, docket no. 14-4.

[466] *Id*. at 191, docket no. 14-2.

Indeed, Hartford's basis for denying William's claim for LTD benefits was not that Williams did not become Disabled while insured under the Plan and Group Policy or that her disability fell within an exclusion to coverage.[467] Rather, Hartford based its denial of Williams's claim for LTD benefits on its determination that "the medical information does not establish that [she] remained Disabled from performing [A]ny [O]ccupation as defined by the [Plan and Group P]olicy."[468] Therefore, whether Hartford breached the express terms of the Plan and Group Policy rests on whether Williams remained Disabled beyond of the effective date of the Plan and Group Policy's Any Occupation provision.

**Williams remained Disabled beyond of the effective date of the Plan and Group Policy's Any Occupation provision**

The Any Occupation provision of the Plan's definition of "Disability" or Disabled" is triggered after 24 months following the Elimination Period.[469] The Any Occupation provision provides that to remain Disabled "[the participant] must be so prevented from performing one or more of the Essential Duties of Any Occupation."[470] "Any Occupation" is defined as:

> [A]n occupation for which [the participant is] qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of [the participant's] Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.[471]

Importantly, the Plan's definition of "Essential Duty" includes "[t]o be at work for the number of hours in [the participant's] regularly scheduled workweek[.]"[472]

---

[467] *Id*. at 192, docket no. 14-2.

[468] *Id*.

[469] *Id*. at 29, docket no. 14-1.

[470] *Id*.

[471] *Id*. at 28, docket no. 14-1.

[472] *Id*. at 29, docket no. 14-1.

Hartford initially denied William's claim for LTD benefits on June 13, 2013.[473] Hartford

stated that it based its decision on "[a]ll the documents contained in [Williams's] file … viewed

as a whole."[474] However, in discussing the basis for its decision, Harford relied on the fact that:

> [Dr. Ayyar's] review of [Williams's] claim indicates that restrictions and
> limitations are not supported beyond [June 6, 2013]. This means that [Williams is]
> not Disabled from [her own] Occupation effective [June 12, 2013] and will not be
> Disabled from Any Occupation as of [June 17, 2013]. [Williams is] not precluded
> from performing the Essential Duties of [her own] Occupation as an Elementary
> School Teacher.[475]

Hartford further discussed that " [Ms. Shelton's] Employability Analysis … showed that there

are a number of occupations for which [Williams is] qualified that are within [her] physical

capabilities."[476] Ms. Shelton based this conclusion on the restrictions and limitations identified

by Dr. Ayyar:

> Sit unlimited; stand/walk no more than 15 minutes continuously for total of 30
> cumulative minutes per hour, maximum of 4 cumulative hours per day; lift up
> to 25 [pounds] up to 3 cumulative [hours] per day, up to 26 [pounds] or more up
> to 30 cumulative minutes per day; occasionally kneel, squat, bend or stoop
> maximum of 2 [hours] per day; activity not formally limited above should be
> considered unlimited. Ms. Williams is able to perform Sedentary demands 8 hours
> per day, 40 hours per week. There is no evidence to support cognitive and/or
> mental restrictions. [477]

Ms. Shelton identified the following occupations as a "representative sample" of the occupations

that Williams could perform: Teacher, Elementary School; Teacher, Mentally Impaired; Teacher,

Vocational Training; Teacher, Learning Disabled; and Jacket Preparer.[478] Hartford concluded that

based on this information:

---

[473] *Id*. at 199-205, docket no. 14-2 and docket no. 14-3.

[474] *Id*. at 202, docket no. 14-3.

[475] *Id*. at 204, docket no. 14-3.

[476] *Id*.

[477] *Id*. at 444, 465, docket no. 14-5.

[478] *Id*. at 445-46, docket no. 14-5.

[Williams is] not prevented from performing the essential duties of Any Occupation. Because of this, [Williams] will not meet the policy definition of Disability as of [June 12, 2013], and [her] LTD benefits will terminate on that date.[479]

After Williams appealed the denial of her claim for LTD benefits, Hartford referred her file to Dr. Rea to perform an independent peer review.[480] In his report, Dr. Rea stated:

While fibromyalgia does not stand as an objective clinical entity (upon which impairment and resultant physical limitations can be based) and the degenerative low back spinal condition is not objectively significant, there is a more solid, objective underpinning for impairment stemming from advanced-level right hip osteoarthritis.[481]

Therefore, based solely on Williams's "hip involvement," Dr. Rea concluded that Williams was capable of full-time work with the following limitations and restrictions:

- Lifting/pulling/pushing/carrying to up to 10 pounds on an occasional basis.
- Sitting for up to 30 minutes at a time for up to 6 hours of sitting over an 8-hour day.
- Walking/standing for up to 15 minutes at a time, for up to 2 hours of walking/standing over an 8-hour day.
- Kneeling on an occasional basis.
- No squatting, crawling, crouching, and climbing.
- Bending on a rare basis.
- There would be no limitations on reaching.
- There would be no limitations for hand usage, such as fingering/handling/grasping/gripping.[482]

Hartford denied Williams's appeal on January 13, 2014.[483] Hartford again stated that it "based [its] decision to deny benefits on policy language and all of the documents contained in the claim file, viewed as a whole."[484] Hartford indicated that "[i]n determining the claim, [it]

---

[479] *Id*. at 204, [docket no. 14-3](#).

[480] *Id*. at 354-61, [docket no. 14-4](#).

[481] *Id*. at 358, [docket no. 14-4](#).

[482] *Id*.

[483] *Id*. at 190-92, [docket no. 14-2](#).

[484] *Id*. at 190, [docket no. 14-2](#).

carefully considered all relevant medical, vocational, and other evidence, including any SSA determinations or materials provided to [Hartford]."[485] Nevertheless, in discussing the basis for the denial, Hartford restated Dr. Rea's assessment and conclusions of Williams's restrictions and limitations, as well as the assessment and conclusions of Dr. Ayyar.[486] Hartford recognized Dr. Inouye's conclusion that Williams [is unable in any way to continue to work as a teacher, [and] is currently disabled[,]" and that Williams had "attended an functional capacit[y] evaluation which concluded she is not capable of performing any level of work."[487] However, despite the conflicting assessments of Williams's functionality, Hartford concluded that:

> [T]he weight of the information in [Williams's] file viewed as a whole supports that [she] is medically capable of performing at least full time sedentary work within the … limitations [identified by Dr. Rea,] and that she is vocationally employable at that work level.[488]

This was Hartford's "final determination" on Williams's claim for LTD benefits.[489]

Ultimately, while Hartford may have viewed all of the information in Williams's file as a whole, its denial of her claim for LTD benefits was based its acceptance of the restrictions and limitations identified by Dr. Ayyar and Dr. Rea, and the conclusions of Ms. Shelton's Employability Analysis.[490] But Dr. Ayyar, Dr. Rea, and Ms. Shelton never personally examined Williams.[491] Moreover, none of them accounted for restrictions and limitations based on Williams's fibromyalgia diagnosis.[492]

---

[485] *Id*. at 191, docket no. 14-2.

[486] *Id*.

[487] *Id*.

[488] *Id*. at 192, docket no. 14-2.

[489] *Id*.

[490] *Id*. at 190-92; 199-205, docket no. 14-2 and docket no. 14-3.

[491] *Id*. at 66, docket no. 14-1, 354-61, docket no. 14-4, 462-66, docket no. 14-5.

[492] *Id*.

The Tenth Circuit Court of Appeals has recognized that "'fibromyalgia presents a conundrum for insurers and courts evaluating disability claims.'"[493] This is because:

> '[fibromyalgia's] cause or causes are unknown, there is no cure, and of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.'[494]

Because fibromyalgia's symptoms are subjective, it naturally follows that the best evidence of whether an individual's fibromyalgia is disabling comes from a personal examination of the individual, including validity testing.

In this case, the best and most credible evidence of Williams's actual restrictions and limitations cause by fibromyalgia comes from Dr. Inouye and the Functional Capacity Evaluation that Williams voluntarily attended. Dr. Inouye explained that he had been treating Williams for 20 years, and that her health had declined over the past two years.[495] Dr. Inouye mapped 17 of 18 positive trigger points on Williams consistent with a diagnosis of fibromyalgia.[496] Throughout the relevant timeframe, Dr. Inouye consistently reported Williams as having worsening pain and fatigue due to fibromyalgia.[497] Dr. Inouye stated that Williams's degree of functionality "depends on [the] day[.]"[498] Dr. Inouye further reported that Williams

---

[493] *Welch v. Unum Life Ins. Co. of America*, 382 F.3d 1078, 1087 (10th Cir. 2004) (quoting *Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)).

[494] *Gilbert v. Astrue*, 231 Fed. Appx. 778, 783 (10th Cir. 2007) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).

[495] Administrative Record at 550, docket no. 14-6, filed Mar. 5, 2015.

[496] *Id*. at 680, docket no. 14-7.

[497] *See e.g. id.* at 381, docket no. 14-4, 524, docket no. 14-6, 675, docket no. 14-7.

[498] *Id.* at 1000, docket no. 14-10.

"has never been a malingerer in [his] extensive association with her[.]"[499] In his most recent APS, Dr. Inouye opined that Williams could only sit for a total of 2-3 hours per workday, stand for a total of 1 hour per workday, and walk for a total of 1 hour per workday.[500] These restrictions and limitations would effectively allow Williams to work a maximum of approximately 4-5 hours per day.[501] Therefore, Dr. Inouye's assessment of Williams's functionality, including restrictions and limitations based on her fibromyalgia diagnosis, was that she "is disabled currently[, and] cannot in any way continue to work as a [full-time] teacher."[502]

Dr. Inouye's assessment of Williams's functionality is supported by the results of Williams's Functional Capacity Evaluation, which took into account her fibromyalgia diagnosis and included validity testing.[503] The evaluator, Mr. Rosello, reported that Williams "[a]ppeared to give full volitional effort" during the testing, as objectified through validity testing.[504] Mr. Rosello noted that "[a]fter 5 minutes rest, [Williams's] ending heart rate was 123 beats per minute and 96% O2 saturation[, with a p]ain level [of] 7/10 in her right hip, back, shoulders and feet."[505] Based on the testing results, Mr. Rosello concluded that "[Williams] does not appear capable of performing work, even in the sedentary category, secondary to deconditioning, increasing pain and muscle weakness."[506]

---

[499] *Id*. at 550, docket no. 14-6 (emphasis omitted).

[500] *Id*. at 709, docket no. 14-8.

[501] *Id*.

[502] *Id*. at 550, docket no. 14-6 (emphasis omitted).

[503] *Id*. at 371-80, docket no. 14-4.

[504] *Id*. at 380, docket no. 14-4.

[505] *Id*.

[506] *Id*.

The assessments of Dr. Inouye and Mr. Rosello, which come from in person examination and account for Williams's fibromyalgia diagnosis,[507] provide the most accurate and complete picture of Williams's functionality. Hartford's decision to reject these assessments and, instead, rely on the peer review assessments of Dr. Ayyar and Dr. Rea, and Ms. Shelton Employability Analysis was improper given the nature of fibromyalgia and the record evidence.

The record evidence reveals that Hartford's Ability Analysts and MCMs repeatedly stated that additional medical information was necessary to accurately determine Williams's restrictions and limitations, and recommended that the most appropriate step to confirm Williams's functionality would be requiring her participation in an IME.[508] However, Hartford chose to forgo an IME based on its belief that the IME providers were located too far away from Williams's home.[509] This rational makes little sense in light of Hartford's denial of Williams's claim for LTD benefits—Hartford determined that Williams was not healthy enough to travel approximately 100 miles to attend an IME,[510] but nevertheless concluded that she is capable of full-time employment in her own occupation as a teacher,[511] or at least full-time sedentary work.[512]

Moreover, while Hartford received information from Williams's other physicians, specifically Dr. Richey and Dr. Jackson, which support its determination that Williams is capable

---

[507] *Id*. at 380, docket no. 14-4, 550, docket no. 14-6, 680, docket no. 14-7, 709, docket no. 14-8, 1000, docket no. 14-10.

[508] *See e.g. id*. at 94, (Mar. 19, 2013 12:27:55 p.m.), 100 (Feb. 28, 2013 3:12:55 p.m.), docket no. 14-1, 108 (Feb. 21, 2013), 112 (Jan. 30, 2013), 119 (Jan. 4, 2013 2:03:31 p.m.), 130 (Oct. 10, 2012), 142 (Aug. 9, 2012 8:58:38 a.m.), 170 (Jan. 24, 2012 3:00:25 p.m.), 179 (Nov. 18, 2011 12:50:26 p.m.; Nov. 21, 2011), docket no. 14-2.

[509] *Id*. at 129 (Oct. 11, 2012 10:14:08 p.m.), 130 (Oct. 11, 2012 9:54:03 p.m.), docket no. 14-2.

[510] *Id*.

[511] *Id*. at 204, docket no. 14-3.

[512] *Id*. at 192, docket no. 14-2.

of at least full-time sedentary work,[513] these opinions did not account for restrictions and limitations caused by fibromyalgia.[514] The restrictions and limitations identified by Dr. Richey related only to Williams's lumbar spine impairment.[515] And Dr. Jackson's opinions related only to Williams's hip issues.[516] Therefore, these assessments do not provide an accurate and complete picture of Williams's functionality.

Hartford's decision to deny Williams's claim for LTD benefits also gave no credence to the peer review of Dr. Green, which concluded that fibromyalgia was "a limiting factor[.]"[517] Dr. Green explained that he "did not feel that there was any symptom magnification here[,]" and noted that Williams's "physicians feel that she is not exaggerating her symptoms."[518]

Because Hartford did not go to the source—Williams—for personal examination to determine her functionality, but rather, simply relied on peer review assessments that did not account for restrictions and limitations based on Williams's fibromyalgia diagnosis, Hartford's determination of Williams's functionality was incomplete and inaccurate. Given the record evidence and the nature of fibromyalgia, Hartford's decision to reject the conclusions of Dr. Inouye and the Functional Capacity Evaluation is unreasonable.

There is no dispute that Williams has fibromyalgia and the undisputed evidence supports a finding that fibromyalgia is a limiting factor to Williams's functionality.[519] Therefore,

---

[513] *Id*. at 406, 408, docket no. 14-5, 576, docket no. 14-6, 866, docket no. 14-9.

[514] *Id*. at 406, 408, docket no. 14-5, 866, docket no. 14-9.

[515] *Id*. at 406, 408, docket no. 14-5.

[516] *Id*. at 866, docket no. 14-9.

[517] *Id*. at 867, docket no. 14-9.

[518] *Id*. at 868, docket no. 14-9.

[519] *Id*. at 380, docket no. 14-4, 550, docket no. 14-6, 680, docket no. 14-7, 709, docket no. 14-8, 1000, docket no. 14-10.

accepting the conclusions of Dr. Inouye and the Functional Capacity Evaluation,[520] which are the most credible and complete assessments of Williams's functionality, Williams is incapable of performing full-time employment. As a result, Williams is "prevented from performing one or more of the Essential Duties of Any Occupation."[521] The Plan's definition of "Essential Duty" includes that the participant "be at work for the number of hours in [the participant's] regularly scheduled workweek[.]"[522] Therefore, Williams remained Disabled beyond of the effective date of the Group Policy's Any Occupation provision, and Hartford breached its contractual duty to Williams by denying her claim for LTD benefits.[523] Even if this were an appropriate case to afford deference to Hartford's determination, which it is not,[524] the result would not change because Hartford's determination of Williams's functionality would remain incomplete, inaccurate, and unreasonable in light of the clear record evidence.

**Williams suffered damages as a result of Hartford's breach**

Under the Plan and Group Policy, benefits are paid equal to $66^{2/3}$% of a claimant's Pre-Disability Earnings, reduced by Other Income Benefits as defined by the Plan and Group Policy.[525] The maximum period of LTD benefit payments is based on the participant's normal retirement age.[526]

---

[520] *Id*.

[521] *Id*. at 29, docket no. 14-1.

[522] *Id*.

[523] *Id*. at 10, docket no. 14-1.

[524] *Supra* at 54-55, 58-65.

[525] Administrative Record at 6, 13, docket no. 14-1, filed Mar. 5, 2015.

[526] *Id*. at 7-8, docket no. 14-1.

Because of Hartford's breach of the Plan and Group Policy in denying Williams's claim for LTD benefits,[527] Williams has not received the LTD benefit payments which she is entitled to since June 16, 2013.[528] Therefore, Williams has suffered damages as a result of Hartford's breach of the Plan and Group Policy. The amount of Williams's damages is not determined in this Memorandum Decision and Order.

## CONCLUSION

Because the record evidence undisputedly demonstrates that Williams has established each of the elements of her breach of contract claim against Hartford,[529] Williams is entitled to summary judgment on her claim.

## ORDER

IT IS HEREBY ORDERED that:

(1)     Williams's Motion for Summary Judgment[530] is GRANTED; and

(2)     Hartford's Motion for Summary Judgment[531] is DENIED.

The parties are directed to meet, confer, and jointly file by February 28, 2017, a report stating the status of this case moving forward.

Signed February 8, 2017.

BY THE COURT:

District Judge David Nuffer

---

[527] *Supra* at 66-77.

[528] Administrative Record at 191, docket no. 14-2, filed Mar. 5, 2015.

[529] *Bair*, 2001 UT 20, ¶ 14.

[530] Docket no. 18, filed Mar. 31, 2015.

[531] Docket no. 17, filed Mar. 31, 2015.